[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as
*Taylor v. First Resolution Invest. Corp.,* Slip Opinion No. 2016-Ohio-3444.]

NOTICE

This slip opinion is subject to formal revision before it is published in an
advance sheet of the Ohio Official Reports. Readers are requested to
promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65
South Front Street, Columbus, Ohio 43215, of any typographical or other
formal errors in the opinion, in order that corrections may be made before
the opinion is published.

SLIP OPINION NO. 2016-OHIO-3444

TAYLOR, EXR., APPELLEE, *v.* FIRST RESOLUTION INVESTMENT CORPORATION
ET AL., APPELLANTS.

[Until this opinion appears in the Ohio Official Reports advance sheets, it
may be cited as *Taylor v. First Resolution Invest. Corp.,* Slip Opinion No.
2016-Ohio-3444.]

*Consumer-debt collection—Fair Debt Collection Practices Act—Ohio Consumer
Sales Practices Act—Statutes of limitations—Accrual of cause of action—
R.C. 2305.03(B), Ohio's borrowing statute—Time-barred collection action
as basis for asserting violations of consumer-protection statutes—R.C.
1343.03(A)—Statutory interest—Debt collector's claim for interest that is
unavailable by law as basis for asserting violations of consumer-protection
statutes—Debt buyers collecting on credit-card debt and their attorneys are
subject to the Ohio Consumer Sales Practices Act.*

(No. 2013-0118—Submitted November 20, 2013—Decided June 16, 2016.)

APPEAL from the Court of Appeals for Summit County,

No. 26042, 2012-Ohio-5653.

_____

**PFEIFER, J.**

{¶ 1} This case began with a default on credit-card debt by an Ohio consumer.  It reaches this court because that consumer alleged violations of the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. 1692 et seq., and the Ohio Consumer Sales Practices Act ("OCSPA"), R.C. 1345.01 et seq., by the entities that purchased her debt and were involved in suing her to collect on it. Today, we determine several issues relevant to the application of the FDCPA and the OCSPA to the collection of purchased credit-card debt in Ohio.  We hold that the underlying cause of action for default on the credit card in this case accrued in Delaware, the home state of the bank that issued the credit card and where the consumer's payments were made, and that Delaware's statute of limitations—through operation of Ohio's borrowing statute—determines whether the collection action was timely filed.  We further hold that the filing of a time-barred collection action may form the basis of a violation under both the FDCPA and the OCSPA. We also hold that that a consumer can bring actionable claims under the FDCPA and the OCSPA based upon debt collectors' representations made to courts in legal filings, specifically on a debt collector's claim for interest that is unavailable to the debt collector by law.  Finally, we hold that debt buyers collecting on credit-card debt and their attorneys are subject to the OCSPA.

## BACKGROUND

### Using Courts to Collect Purchased Debt

{¶ 2} The questions presented to us arise from the now common phenomenon of debt sales, in which a creditor sells an individual's debt to a private entity that then attempts to collect the debt.  The sale of debt can provide grease for the wheels of commerce.  "Debt buying can reduce the losses that creditors incur in providing credit, thereby allowing creditors to provide more credit at lower prices."  Federal Trade Commission, *The Structure and Practices of the Debt*

*Buying Industry* (Jan. 2013) i, available at http://www.ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf (accessed Mar. 14, 2016) ("*Structure and Practices*"). Private debt collectors often employ the court process to collect the debt that they have purchased, and thus, courts have become vital cogs in the machinery of debt collection. The threat of a lawsuit, an executed lawsuit, or a judgment can be a powerful, intimidating force against a consumer.

*A Problematic Process*

**{¶ 3}** First-party debts are debts owed by a consumer to an entity that initially extended credit to the consumer. Note, *Improving Relief from Abusive Debt Collection Practices,* 127 Harv.L.Rev. 1447 (2014), fn. 1. When a consumer falls in arrears on paying a debt, "first-party creditors frequently charge off the debt (that is, account for the debt as being unrecoverable) and sell the rights to the delinquent debt to debt buyers and collection agencies who specialize in the collection of delinquent debts." *Id.*, citing Consumer Financial Protection Bureau, *Fair Debt Collection Practices Act: CFPB Annual Report 2013*, at 8-9 (2013). Those debts are then "bundled" into portfolios, which are purchased by debt buyers through a bidding process, usually at a steep discount from the face value of the debts. *Improving Relief* at 1448.

**{¶ 4}** During the debt-sale process, documentation of information about the debt is often lost. Debt buyers receive some information about the debt, but "[f]or most portfolios, buyers did not receive any documents at the time of purchase" and "[o]nly a small percentage of portfolios included documents, such as account statements or the terms and conditions of credit." *Structure and Practices* at iii. "Even when [account documents] are available and debt buyers request them, banks often require additional payments to supply them. Such demands can prove prohibitively expensive or encourage debt collectors to gather detailed evidence only in sporadic cases." Horwitz, *Banks Face Official Backlash Against Card Debt*

*Collection Practices*, American Banker (Jan. 16, 2013), available at http://www.americanbanker.com/issues/178_12/banks-face-official-backlash-against-card-debt-collection-practices-1055929-1.html?pg=2 (accessed Mar. 14, 2016).

**{¶ 5}** Debt collectors go to court with the information they have.  As an industry that buys debt for an average of four cents per dollar of face value, *Structure and Practices* at ii, consumer-debt collection, by its very nature, is a high-volume enterprise.  It is dependent in large part on the acquiescence, ambivalence, or ignorance of consumers:

> The consumer debt collection industry is premised on a high-volume business model.  Debt buyers holding portfolios of debts with a low ratio of book value to face value seek to collect on a sufficient number of debts to generate a profit, through direct collection efforts as well as lawsuits.  Empirical evidence shows that many debt buyers using a high volume of lawsuits as a component of their recovery strategy rely heavily on the assumption that consumers often fail to show up to contest the case; this assumption is largely valid.  There may be several reasons for such a failure to respond.  Some of these reasons may themselves be related to FDCPA violations, including defective notice, or may stem from a (mistaken) consumer belief that no response is required if the debt being sued upon is not actually hers.  Most simply, many consumers may not respond due to a misunderstanding of the legal procedures required to avoid default.  In addition, some debt collectors rely on the assumption of default to pursue what has been called a "scattershot" approach, whereby they file many lawsuits with the

hope of securing default judgments, but without the intent to actually litigate them should the opposing parties respond.

(Footnotes omitted.) *Improving Relief*, 127 Harv.L.Rev. at 1449.

{¶ 6} A predictable result of debt buyers filing a high volume of lawsuits based on imperfect information is that lawsuits are regularly filed after the right to collect debts has expired or that seek a debt that is not owed; "each year, buyers sought to collect about one million debts that consumers asserted they did not owe." *Structure and Practices* at iv.

**Statutory Protections**

*The FDCPA*

{¶ 7} Federal and state statutes in play in this case provide protections against such debt-collection abuses. "Congress passed the FDCPA to address 'what it considered to be a widespread problem' of consumer abuse at the hands of debt collectors." *Wise v. Zwicker & Assocs., P.C.*, 780 F.3d 710, 712-713 (6th Cir.2015), quoting *Frey v. Gangwish,* 970 F.2d 1516, 1521 (6th Cir.1992). The intent of the FDCPA is to "eliminate abusive debt collection practices" that have contributed to personal bankruptcies, job loss, and invasions of individual privacy. 15 U.S.C. 1692(a) and (e); *Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich, L.P.A.*, 559 U.S. 573, 577, 130 S.Ct. 1605, 176 L.Ed.2d 519 (2010). "In reaction to the size of the problem, [Congress] crafted 'an extraordinarily broad' remedial statute." *Wise* at 713, quoting *Frey* at 1521. The FDCPA prohibits debt collectors from employing "any false, deceptive, or misleading representation or means in connection with the collection of any debt," including misrepresenting "the character, amount, or legal status of any debt." 15 U.S.C. 1692e(2)(A). A debt collector may not employ any "unfair or unconscionable means to collect or attempt to collect any debt," 15 U.S.C. 1692f, and cannot collect "any amount (including any interest, fee, charge, or expense incidental to the principal obligation) unless

such amount is expressly authorized by the agreement creating the debt or permitted by law," 15 U.S.C. 1692f(1).

{¶ 8} When analyzing whether conduct giving rise to the claim fits within the broad scope of the FDCPA, "the conduct is viewed through the eyes of the 'least sophisticated consumer.' " *Currier v. First Resolution Invest. Corp.*, 762 F.3d 529, 533 (6th Cir.2014). That standard, while protecting "the gullible and the shrewd alike," also presumes "a basic level of reasonableness and understanding on the part of the debtor." *Id.*

{¶ 9} A plaintiff must prove four essential elements to establish a prima facie case for a violation of the FDCPA:

> 1. [T]he plaintiff is a natural person who is harmed by violations of the FDCPA, or is a "consumer" within the meaning of 15 U.S.C.A. §§ 1692a(3), 1692(d) for purposes of a cause of action, 15 U.S.C.A. § 1692c or 15 U.S.C.A. § 1692e(11);
> 2. [T]he "debt" arises out of a transaction entered primarily for personal, family, or household purposes, 15 U.S.C.A. § 1692a(5);
> 3. [T]he defendant collecting the debt is a "debt collector" within the meaning of 15 U.S.C.A. § 1692a(6); and
> 4. [T]he defendant has violated, by act or omission, a provision of the FDCPA, 15 U.S.C.A § 1692a–1692o; 15 U.S.C.A § 1692a; 15 U.S.C.A § 1692k.

*Whittiker v. Deutsche Bank Natl. Trust Co.*, 605 F.Supp.2d 914, 938-939 (N.D.Ohio 2009). "The absence of any one of the four essential elements is fatal to a FDCPA lawsuit." *Id.* at 939.

{¶ 10} A plaintiff does not need to demonstrate that he or she suffered actual damages in order to prevail on an FDCPA claim; the FDCPA "places the risk of penalties on the debt collector that engages in activities which are not entirely lawful, rather than exposing consumers to unlawful debt-collector behavior without a possibility for relief." *Stratton v. Portfolio Recovery Assocs., L.L.C.,* 770 F.3d 443, 449 (6th Cir.2014). Further, courts have characterized the FDCPA as a strict-liability statute, *Fed. Home Loan Mtge. Corp. v. Lamar*, 503 F.3d 504, 513 (6th Cir. 2007); to establish liability, a plaintiff does not have to prove knowledge or intent of the debt collector, *Wise*, 780 F.3d at 713.

{¶ 11} Who is potentially liable under the FDCPA? The FDCPA excludes first-party creditors engaged in debt collection, but the statute broadly reaches the actions of "debt collectors," an inclusive statutory term that covers third-party debt collectors as well as attorneys who regularly engage in debt-collection activities, including litigation to collect debts owed by consumers. *See* 15 U.S.C. 1692a(6); *Heintz v. Jenkins*, 514 U.S. 291, 293-294, 297-299, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995). In fact, in response "to the explosion of law firms conducting debt collection businesses," Congress in 1986 specifically repealed a prior version of the FDCPA that had afforded attorneys an exemption from the statute's reach. *Hemmingsen v. Messerli & Kramer, P.A.*, 674 F.3d 814, 817 (8th Cir.2012); *see McCollough v. Johnson, Rodenburg & Lauinger, L.L.C.,* 637 F.3d 939, 951 (9th Cir.2011).

*The OCSPA*

{¶ 12} As we hold later in this opinion, the OCSPA also provides protections for consumer debtors against debt collectors and their attorneys. The act states that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction." R.C. 1345.02(A). R.C. 1345.03(A) provides that "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction." State and federal courts in Ohio have

held that the OCSPA applies to debt collectors and to litigation activities. *See, e.g., Hartman v. Asset Acceptance Corp.*, 467 F.Supp.2d 769, 780 (S.D.Ohio 2004), and cases cited therein. We confirm the validity of those precedents today.

## FACTUAL AND PROCEDURAL HISTORY

{¶ 13} Sandra J. Taylor Jarvis[1] obtained a credit card, used it to make purchases over several years, but she was eventually unable to make scheduled minimum payments on the account, and the account was declared delinquent. Taylor Jarvis's debt was purchased and resold and eventually became owned by appellant First Resolution Investment Corporation ("FRIC"), a subsidiary of a Canadian corporation, appellant First Resolution Management Corporation ("FRMC"). FRIC had incomplete documentation of the terms of the credit-card agreement. Despite the centrality of the credit-card agreement to the parties' positions in this litigation, no party has been able to produce it, and it is not in the record before us.

{¶ 14} The case before us proceeded like many others. FRIC hired appellants, Cheek Law Offices, L.L.C., and Parri Hockenberry, Esq. (collectively "Cheek"), to file a lawsuit to collect on the debt. Cheek filed a complaint on March 9, 2010, and filed a motion for default judgment less than two months later. Within a week of that motion, FRIC had a signed entry from the trial judge granting it a default judgment, awarding it everything that it had asked for. Like clockwork, this case started out as a typical case in the world of debt buying.

{¶ 15} But Taylor Jarvis was different from most defendants who are sued in this way. She found out about the judgment against her and decided to fight it. Six weeks after the entry of the default judgment, she successfully moved to vacate it, and she later raised counterclaims against FRIC and Cheek. By doing so, she has given this court the opportunity to address issues in her case that happen to be

---

[1] Taylor Jarvis was the original appellee in the appeal to this court, but she died during its pendency. Brian Taylor, the executor of her estate, has been substituted for her as the appellee.

endemic to the whole debt-collection world and that impact Ohio courts. Those issues include how to determine the proper statute of limitations in debt-collection cases and whether the filing of lawsuits containing unsubstantiated claims can constitute violations of the FDCPA and the OCSPA.

**The Credit-Card Account and the Collection Action Against Taylor Jarvis**

*Offer and Acceptance*

**{¶ 16}** Taylor Jarvis was a resident and domiciliary of Summit County. In 2001, Taylor Jarvis was solicited with a credit-card application in Ohio, completed that application in Ohio, and mailed it from Ohio to the issuing bank in Delaware, where it was approved. After her application was approved, Taylor Jarvis began using the credit card. The issuing bank eventually became, through acquisitions, Chase Bank USA, N.A. Although Taylor Jarvis's credit-card account was with banks with three different names over the years, it was always the same account, and we collectively refer to the banks as "Chase." There is no evidence that she used the card for anything other than making purchases for personal, household, and family use.

*Account History*

**{¶ 17}** Taylor Jarvis made payments on the account through at least part of 2004 and mailed those payments to an address in the state of Delaware; one invoice in the record with a payment-due date of February 3, 2004, requested that payment be made to an address in Illinois, but Taylor Jarvis stated in an affidavit that she mailed all payments to Delaware, and there is no evidence in the record that contradicts that statement. She last used the card for a purchase on May 5, 2004. She then fell into arrears.

**{¶ 18}** Taylor Jarvis did not make the scheduled minimum payment on the account that was due on January 1, 2005, and made no scheduled minimum monthly payments thereafter. Her account was declared delinquent by Chase in February 2005. Subsequent credit-card billing statements during 2005 informed Taylor

Jarvis that her account was past due and warned her that she could lose charging privileges on the account unless payment was made. Chase's billing statement to Taylor Jarvis for the payment due on May 2, 2005, which covered the billing period from March 8 through April 7, stated, "Your charge privileges are now revoked." By January 31, 2006, Chase had "written off" Taylor Jarvis's account.

{¶ 19} After suspending her charging privileges, Chase continued to send Taylor Jarvis bills, including one requesting payment by February 1, 2006. That bill showed a past-due amount of $1,481, a minimum payment due of $1,707, and a balance of $9,065.37. That bill also showed that Taylor Jarvis was making payments on the account, albeit in amounts less than the minimum due. Taylor Jarvis made her last payment to Chase on the account, for $50, on June 28, 2006. She had made a total of $1,150 in payments after the suspension of her charging privileges.

{¶ 20} In February 2008, Chase sold its rights to Taylor Jarvis's account to Unifund Portfolio A, L.L.C. ("Unifund"). In June 2008, Unifund sold those rights to FRIC.

{¶ 21} On September 16, 2009, FRIC, through FRMC, sent a "final notice" to Taylor Jarvis. That notice advised Taylor Jarvis that her account had been forwarded to a "pre-litigation department" and that unless the account was resolved within 21 days, FRIC would forward the claim to a collection attorney.

*Litigation*

{¶ 22} On November 3, 2009, Cheek Law Offices sent Taylor Jarvis a letter informing her that FRIC had advised Cheek that Taylor Jarvis owed $15,818.50 on the account. Four months later, on March 9, 2010, Cheek filed suit against Taylor Jarvis in Summit County Common Pleas Court seeking $8,765.37 on the account, accrued interest of $7,738.99, and future interest of 24 percent. FRIC attached to its complaint copies of the bills of sale of the rights to the account from Chase to Unifund and from Unifund to FRIC, as well as a copy of one of the monthly billing

statements that Chase had sent to Taylor Jarvis in 2006. The attached statement showed that Taylor Jarvis was being charged interest on the unpaid balance on the account at the rate of 24.99 percent. FRIC did not attach to the complaint a copy of the credit-card agreement between Taylor Jarvis and Chase.

{¶ 23} Cheek filed a motion for default judgment on May 5, 2010, with an accompanying affidavit from a FRIC employee, claiming that Taylor Jarvis owed $8,765.37, accrued interest in the amount of $8,067.51, and continuing further interest at the rate of 24 percent. By May 12, 2010, FRIC had a signed entry from the trial judge granting it a default judgment, awarding it everything that it had asked for.

## Taylor Jarvis's Counterclaims

{¶ 24} On June 28, 2010, Taylor Jarvis filed a motion to vacate the judgment, and on July 26, 2010, the court granted the motion. On August 6, 2010, Taylor Jarvis answered the original complaint, raising several affirmative defenses, including a statute-of-limitations defense, and filed a number of class-action counterclaims; her amended version of the counterclaims, filed on August 26, 2010, included claims against FRIC, FRMC, and Cheek. Those claims were based on alleged violations of the FDCPA and the OCSPA, along with a common-law claim for abuse of process.

{¶ 25} Taylor Jarvis's statutory claims flow from two theories—first, that FRIC's claim against Taylor Jarvis was time-barred by the statute of limitations and second, that FRIC sought interest on Taylor Jarvis's debt that was unavailable to FRIC by law. Taylor Jarvis alleged that threatening to file a time-barred claim and actually filing a time-barred claim against her constituted misleading and deceptive collection practices under 15 U.S.C. 1692e and the OCSPA and unfair and unconscionable collection practices under 15 U.S.C. 1692f and the OCSPA. Central to Taylor Jarvis's statute-of-limitations-based claims is the position that FRIC's claims against her accrued in Delaware and are thus governed by

Delaware's statute of limitations through operation of Ohio's borrowing statute, R.C. 2305.03(B). According to Taylor Jarvis, because Delaware law affords only a three-year statute of limitations for actions to collect on debts, Del.Code Ann., Title 10, 8106(a), FRIC and Cheek knowingly brought an action that was barred by the statute of limitations, thereby violating state consumer-protection and federal fair-collection-practice laws.

{¶ 26} Taylor Jarvis also asserts that FRIC and Cheek improperly sought 24 percent interest on her debt in the complaint against her, purportedly under the terms of the cardholder agreement. Taylor Jarvis asserted that since FRIC could produce no written contract that set forth a rate of interest higher than the statutory rate, it was limited to the statutory interest rate—4 percent at the time of the filing of the complaint—pursuant to R.C. 1343.03. She further asserted that the actions of FRIC and Cheek in seeking in the complaint more interest than was recoverable constituted violations of U.S.C. 1692e and 1692f as well as the OCSPA.

*The Trial Court's Rulings*

{¶ 27} After FRIC dismissed without prejudice its complaint against Taylor Jarvis pursuant to Civ.R. 41(A), the trial court realigned the parties so that Taylor Jarvis was the plaintiff. On cross-motions for summary judgment, the trial court then entered judgment for Cheek and FRIC on Taylor Jarvis's claims.

{¶ 28} As the trial court noted, Taylor Jarvis's case turned, "in large part, on whether Ohio's borrowing statute applies to the facts of this case." It stated:

> If the Court determines that Ohio's borrowing statute applies to this case, the next question is whether [FRIC's] claims accrued in Ohio or Delaware. If the Court determines that the claims accrued in Delaware, then they may be barred by Delaware's three-year statute of limitations.

**{¶ 29}** The trial court held that the borrowing statute did not apply, that Ohio law governed the determination of the statute of limitations, that Ohio law imposed either a 6- or 15-year statute of limitations, and that under either limitation period FRIC's suit against Taylor Jarvis was commenced timely because it was brought within six years of Taylor Jarvis's breach.

**{¶ 30}** The court also ruled that Taylor Jarvis failed to show that FRIC and Cheek violated the FDCPA or the OCSPA by requesting in a complaint postjudgment interest in excess of the statutory rate. The court reasoned that a prayer for relief in a complaint is not a demand to the debtor but is rather a request for consideration to a court. Finally, the trial court also granted summary judgment to FRIC and Cheek on Taylor Jarvis's common-law abuse-of-process claim.

*The Court of Appeals Reverses and Remands*

**{¶ 31}** On appeal, the Ninth District Court of Appeals reversed, holding that Delaware's statute of limitations applied to FRIC's claims. 2012-Ohio-5653, 983 N.E.2d 380, ¶ 29, 35-36 (9th Dist.). The appellate court further held that FRIC's suit to collect on the debt was time-barred and remanded the matter to the trial court for consideration of Taylor Jarvis's claims. *Id*. at ¶ 36, 42.

**{¶ 32}** The court also reversed the trial court's ruling on Taylor Jarvis's claims based upon the interest rate sought by FRIC. The court held that FRIC in its complaint was "enunciating its absolute entitlement to interest at a rate of 24 percent and * * * was demanding such from Ms. Jarvis, not from the trial court," and that Taylor Jarvis had established prima facie claims against FRIC and Cheek under the FDCPA and the OCSPA. *Id.* at ¶ 41. The court remanded the issue regarding the rate of interest sought to the trial court to consider whether the bona fide error defense of 15 U.S.C. 1692k(c) applied:

> Because the trial court found that a prayer in a complaint for interest
> was not a demand to the debtor, it did not consider whether genuine

13

issues of material fact existed regarding the existence of a bona fide
error defense.  This Court declines to address that issue in the first
instance.

*Id.* at ¶ 42.  Under 15 U.S.C. 1692k(c), a debt collector can escape liability by
showing "by a preponderance of evidence that the violation was not intentional and
resulted from a bona fide error notwithstanding the maintenance of procedures
reasonably adapted to avoid any such error."

{¶ 33} The cause is before this court upon the acceptance of a discretionary
appeal.  135 Ohio St.3d 1412, 2013-Ohio-1622, 986 N.E.2d 29.

## LAW AND ANALYSIS

### The Statute of Limitations

{¶ 34} Statutes of limitations are designed to protect defendants from stale
claims, but for many consumers, they do not.  In most states, the expiration of the
statute of limitations does not automatically extinguish a debt and is instead

an affirmative defense that consumers themselves must raise and
prove before courts will dismiss actions to collect on their debts.  As
the [Federal Trade] Commission has noted, because 90% or more of
consumers sued in these actions do not appear in court to defend,
filing these actions creates a risk that consumers will be subject to a
default judgment on a time-barred debt.

*Structure and Practices* at 45.

{¶ 35} The filing of a time-barred lawsuit by a debt collector has been held
to constitute a violation of 15 U.S.C. 1692e and 1692f for falsely representing the
legal status of a debt and employing an unfair means to attempt to collect a debt.
*Phillips v. Asset Acceptance, L.L.C.*, 736 F.3d 1076, 1079 (7th Cir.2013); *Dudek v.*

*Thomas & Thomas Attorneys & Counselors at Law, L.L.C.*, 702 F.Supp.2d 826, 833 (N.D.Ohio 2010). The court in *Suesz v. Med-1 Solutions, L.L.C.*, 757 F.3d 636, 639 (7th Cir.2014) (en banc) described the too-common scenario: "[T]he debt collector hopes that the debtor will be unaware that he has a complete defense to the suit and so will default, which will enable the debt collector to garnish the debtor's wages."

**{¶ 36}** Thus, determining the correct statute of limitations on the underlying collection action is essential to this case and others like it. The appellate court below held that this court's decision in *Gries Sports Ents., Inc. v. Modell*, 15 Ohio St.3d 284, 473 N.E.2d 807 (1984), and 1 Restatement of the Law 2d, Conflict of Laws, Section 188 (1971), apply to the conflict-of-laws question in this case. *See* 2012-Ohio-5653, 983 N.E.2d 380, at ¶ 24. That conclusion was correct insofar as this case may implicate questions as to the applicable *substantive* law regarding the credit-card agreement. But the salient question is whether the statute of limitations, which is governed by *procedural* law, had run. "[L]imitation provisions are remedial in nature, and are therefore controlled by the law of the forum." *Howard v. Allen*, 30 Ohio St.2d 130, 133, 283 N.E.2d 167 (1972). As this court stated in *Kerper v. Wood*, 48 Ohio St. 613, 622, 29 N.E. 501 (1891): "Statutes of limitations relate to the remedy, and are, and must be, governed by the law of the forum; for it is conceded that a court which has power to say when its doors shall be opened has also power to say when they shall be closed."

**{¶ 37}** Since Ohio is the forum state of this case, Ohio law determines the statute of limitations. But Ohio has a borrowing statute, which is a legislative exception to the general rule that a forum state always applies its own statute-of-limitations law. *Combs v. Internatl. Ins. Co.,* 354 F.3d 568, 578 (6th Cir.2004). In essence, a borrowing statute directs a forum court to "borrow" the limitation period of another state if the cause of action accrued in that foreign state and that state's limitation period is shorter than the forum state's limitation period. *Dudek* at 835,

citing *Combs* at 578, and *CMACO Automotive Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 244 (6th Cir.2009). Pursuant to its borrowing statute, R.C. 2305.03(B), Ohio applies the statute of limitations of the state where the cause of action accrued in instances when that state's statute of limitations is shorter. R.C. 2305.03(B) provides:

> No civil action that is based upon a cause of action that accrued in any other state, territory, district, or foreign jurisdiction may be commenced and maintained in this state if the period of limitation that applies to that action under the laws of that other state, territory, district, or foreign jurisdiction has expired or the period of limitation that applies to that action under the laws of this state has expired.

**{¶ 38}** As the trial court held, the key issue in determining the applicable statute of limitations in this case is the effect of R.C. 2305.03(B). That statute determines whether the statute of limitations of Ohio—Taylor Jarvis's home—or Delaware—where Chase is headquartered and where Taylor Jarvis stated in her affidavit that she mailed her signed credit-card agreement and sent all of her payments—is applicable in this case.

**{¶ 39}** The borrowing statute prevents a litigant from gaining the benefit of an Ohio statute of limitations when the state where the cause accrued has a shorter statute of limitations. As the United State Supreme Court wrote about Ohio's earlier, similar version of the borrowing statute that was later repealed, "The purpose of the state's borrowing statute as those of other states, was apparently to require its courts to bar suits against an Ohio resident if the right to sue him had already expired in another state where the combination of circumstances giving rise

to the right to sue had taken place." (Footnotes omitted.) *Cope v. Anderson*, 331 U.S. 461, 466, 67 S.Ct. 1340, 91 L.Ed. 1602 (1947).

{¶ 40} There is no dispute that as applicable to this case, Ohio law provided that the statute of limitations for suit on a written contract was 15 years. Former R.C. 2305.06. The statute of limitations for suit on a contract not reduced to writing is six years. R.C. 2305.07. In this case, the parties failed to enter the written credit-card agreement into evidence. Accordingly, absent the borrowing statute, the applicable limitation period for FRIC's suit would be supplied by R.C. 2305.07, which limits the viability of any action to six years after the cause of action accrued.

{¶ 41} But if the borrowing statute is applicable to this case, Delaware's shorter, three-year statute of limitations on contract actions applied to the collection action, rather than Ohio's six-year statute of limitations.

*The Jurisdiction of Accrual*

{¶ 42} Where the cause of action accrued is the key element of the borrowing statute. Thus, we must determine where the underlying collection claims accrued in this case. The most relevant precedent favors the conclusion that the cause of action accrued in Delaware, which is where the debt was to be paid and where Chase suffered its loss.

{¶ 43} In *Meekison v. Groschner*, 153 Ohio St. 301, 306-307, 91 N.E.2d 680 (1950), this court addressed the question of where a cause of action accrued on a promissory note that had been executed in Michigan, but that required the promisor to pay off the note in Napoleon, Ohio. This court considered whether Ohio's borrowing statute in place at that time (which was very similar to current R.C. 2305.03(B)) required that the cause of action on the unpaid note should be subject to Michigan's statute of limitations or Ohio's. This court concluded that the claim arose not where the contract was executed—Michigan—but where the contract was made payable—Ohio:

Where was that default? The Heaths were obligated to pay the note at Napoleon, Ohio. If it was not paid at Napoleon on its due date, a default would occur at Napoleon and a cause of action would arise for the first time because of the default at Napoleon. It seems to us unassailable that the cause of action arose where the default occurred, and therefore the Ohio statute * * * governs the instant case and an action on the note must be brought within 15 years after the cause thereof accrued.

*Id* at 307. The Heaths were residing in Michigan when they made the decision to not pay the note. Thus, where they were when they made the decision to not pay the note played no role in this court's determination of where the cause of action accrued.

{¶ 44} In a case directly on point, involving a suit based on a New York resident's default on a credit card issued by a Delaware bank, New York's highest court held that New York's borrowing statute required an application of Delaware's statute of limitations, because the cause of action for nonpayment accrued in Delaware. The court held that "[i]f the claimed injury is an economic one, the cause of action typically accrues 'where the plaintiff resides and sustains the economic impact of the loss.' " *Portfolio Recovery Assocs., L.L.C. v. King*, 14 N.Y.3d 410, 416, 901 N.Y.S.2d 575, 927 N.E.2d 1059 (2010), quoting *Global Fin. Corp. v Triarc Corp.*, 93 N.Y.2d 525, 529, 693 N.Y.S.2d 479, 715 N.E.2d 482 (1999). Since the bank was located in Delaware, that state's statute of limitations applied.

{¶ 45} In *Hamid v. Stock & Grimes, L.L.P.*, E.D.Pa. No. 11-2349, 2011 U.S. Dist. LEXIS 96245 (Aug. 26, 2011), the court determined that Pennsylvania's borrowing statute required an application of Delaware's statute of limitations because the cause of action for nonpayment on a credit card accrued in Delaware, where the bank failed to receive payment:

18

Here, the damage to Discover Bank occurred when it did not receive the payment due on August 12, 2006 at its post office box in Dover, Delaware. While Hamid's failure to mail her payment may have set events in motion, it was in Delaware where the final significant event took place, that is, where Discover Bank sustained injury from non-payment of Hamid's debt. It was not until Discover Bank failed to receive Hamid's check on August 12, 2006 that it was able to sue her for breach of contract. We conclude that the place where the claim in the underlying action accrued was in Delaware.

*Id.* at *5-6.

{¶ 46} In another case directly on point, *Conway v. Portfolio Recovery Assocs., L.L.C.*, 13 F.Supp.3d 711 (E.D.Ky.2014), the court, in applying Kentucky's borrowing statute, held that the credit card issuer's breach-of-contract claim against a Kentucky-resident cardholder accrued in Virginia, the location where the bank, Capital One, should have received payment. The court sought to identify where " 'the injurious consequences of the alleged wrongful conduct occurred.' " *Id*. at 718, quoting *Abel v. Austin*, 411 S.W.3d 728, 737 (Ky.2013).

{¶ 47} The court pointed out the impracticality of using the location where the cardholder made the decision to not make his payment as the place of the accrual of the action:

Presumably, Capital One has similar agreements with multiple customers in multiple locations, but receives payments from those customers at one central location. It would be impossible for Capital One to know where any of those customers happen to be when they *decide* not to pay. Rather, as a practical matter, the only way Capital

One can determine a customer is in default is when payment is not received at the central location in Virginia by a certain date.

(Emphasis sic.) *Id*. at 720-721. The court concluded that "[b]ecause the due date passing without payment being received was the final event that allowed Capital One's cause of action to accrue, and was also the event that actually resulted in damages to Capital One, the breach must have occurred when and where payment was not received, which in this case was Virginia." *Id*. at 719.

{¶ 48} We follow our own precedent and that of New York's highest court and the cited federal courts and hold that the cause of action against Taylor Jarvis for her failure to pay the debt accrued in the jurisdiction where the debt was to be paid, Delaware.

*The Time of Accrual*

{¶ 49} The time of accrual of the cause of action on Taylor Jarvis's debt is an important consideration in this case not only to determine from what point the statute of limitations begins to run: FRIC and Cheek argue that the cause of action on the debt accrued before the effective date of R.C. 2305.03(B), so that even if Chase's cause of action accrued in Delaware, Ohio's borrowing statute is inapplicable. The effective date of R.C. 2305.03(B) was April 7, 2005. Am.Sub.S.B. No. 80, 150 Ohio Laws, Part V, 7915, 7930-7931, 8037. The trial court apparently accepted the arguments of FRIC and Cheek that Chase's claims accrued when Taylor Jarvis failed to make the minimum monthly payment in January 2005, and it found that since Chase's claims accrued prior to the effective date of the statute, the borrowing statute could not apply. We agree that the cause of action accrued when Taylor Jarvis failed to make her minimum payment in January 2005, but we determine that R.C. 2305.03(B) nonetheless applies to the cause of action against her.

**{¶ 50}** Although there is no credit-card agreement in evidence in this case, Taylor Jarvis has not disputed that a contract existed between her and Chase. "Credit card agreements are contracts whereby the issuance and use of a credit card creates a legally binding agreement." *Bank One, Columbus, N.A. v. Palmer,* 63 Ohio App.3d 491, 493, 579 N.E.2d 284 (10th Dist.1989). There is no dispute that a precursor of Chase issued a credit card to Taylor Jarvis and that she used the card to make purchases. A cause of action for breach of a credit-card agreement based on nonpayment accrues when the obligation to pay under the agreement becomes due and owing and the cardholder does not make an agreed-to monthly payment. *Dudek*, 702 F.Supp.2d at 839; *Citibank, N.A. v. Hyslop*, 10th Dist. Franklin No. 12AP-885, 2014-Ohio-844, ¶ 16-17; *Discover Bank v. Heinz*, 10th Dist. Franklin No. 08AP-1001, 2009-Ohio-2850, ¶ 17; *Discover Bank v. Poling*, 10th Dist. Franklin No. 04AP-1117, 2005-Ohio-1543, ¶ 18.

**{¶ 51}** Taylor Jarvis also has not disputed that under her contract she was bound to make a minimum monthly payment. Nor has she disputed that she failed to make the minimum payment due on January 1, 2005, and failed to make a minimum payment thereafter. We have already held that the cause of action accrued in Delaware, where Chase Bank did not receive payment from Taylor Jarvis. The location of accrual informs the time of the accrual:

> [T]he elements of time and place of accrual are inextricably intertwined: "The time when a cause of action arises and the place where it arises are necessarily connected, since the same act is the critical event in each instance. The final act which transforms the liability into a cause of action necessarily has both aspects of time and place."

*CMACO Automotive Sys.,* 589 F.3d at 243, fn. 7, quoting *Helmers v. Anderson,* 156 F.2d 47, 51 (6th Cir.1946).

{¶ 52} We determine that the cause of action accrued when Taylor Jarvis failed to make the minimum payment due in January 2005.

{¶ 53} But this finding does not make Ohio's borrowing statute inapplicable in this case. It is true that Article II, Section 28 of the Ohio Constitution prohibits the General Assembly from enacting retroactive laws. But there is no indication that the General Assembly intended R.C. 2305.03(B) to be retroactive—it is written to apply prospectively to all cases commenced after its effective date. The statute reads:

> No civil action that is based upon a cause of action that accrued in any other state * * * *may be commenced and maintained* in this state if the period of limitation that applies to that action under the laws of that other state * * * has expired or the period of limitation that applies to that action under the laws of this state has expired.

(Emphasis added.)

{¶ 54} R.C. 2305.03(B) applies to civil actions "commenced and maintained" in Ohio after the effective date of the statute. "Statutes of limitations are remedial in nature." *Flagstar Bank, F.S.B. v. Airline Union's Mtge. Co.*, 128 Ohio St.3d 529, 2011-Ohio-1961, 947 N.E.2d 672, ¶ 7. And this court has held that " '[l]aws of a remedial nature providing rules of practice, courses of procedure, or methods of review are applicable to any proceedings conducted after the adoption of such laws.' " *Estate of Johnson v. Randall Smith, Inc.,* 135 Ohio St.3d 440, 2013-Ohio-1507, 989 N.E.2d 35, ¶ 20, quoting *Kilbreath v. Rudy,* 16 Ohio St.2d

70, 242 N.E.2d 658 (1968), paragraph two of the syllabus. Thus, as a remedial statute, the borrowing statute applies to proceedings conducted after its adoption.

{¶ 55} But what of the concern that R.C. 2305.03(B) potentially applies to causes of action that accrued but were not commenced before the effective date of the statute? This court has recognized that a statute that applies prospectively may, through its operation, violate the Retroactivity Clause if it destroys vested rights:

> We have also stated that the "retroactivity clause nullifies those new laws that 'reach back and create new burdens, new duties, new obligations, or new liabilities not existing at the time [the statute becomes effective].' *Miller v. Hixson* (1901), 64 Ohio St. 39, 51, 59 N.E. 749, 752." *Bielat* [*v. Bielat*], 87 Ohio St.3d [350,] 352-353, 721 N.E.2d 28 [2000]. In *Van Fossen* [*v. Babcock & Wilcox Co.,* 36 Ohio St.3d 100, 522 N.E.2d 489 (1988)]*,* this court stated that the constitutional limitation against retroactive laws " 'include[s] a prohibition against laws which commenced on the date of enactment and which operated in futuro, but which, in doing so, divested rights, particularly property rights, which had been vested anterior to the time of enactment of the laws.' " [*Id*. at 105], quoting Smead, The Rule Against Retroactive Legislation: A Basic Principle of Jurisprudence (1936), 20 Minn.L.Rev. 775, 781-782.

*Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce*, 127 Ohio St.3d 511, 2010-Ohio-6207, 941 N.E.2d 745, ¶ 14.

{¶ 56} The shortening of a statute of limitations, however, does not necessarily extinguish a vested right. This court has held that the shortening of a statute of limitations is constitutionally permissible when it does not destroy an

existing cause of action. The continued vitality of the cause of action after the amendment of the statute is the crucial factor in the inquiry. This court has

> delineated between the operation of an amended statute of limitations which *totally* obliterates an existing substantive right and one which merely shortens the period of time in which the remedy can be realized. The latter application of an amended statute is not unlawful as long as a prospective claimant or litigant * * * is still afforded " 'a reasonable time [within] which to enforce' his right." [*Gregory v.*] *Flowers* [, 32 Ohio St.2d 48,] 54 [,290 N.E.2d 181 (1972), quoting *Smith v. New York Cent. RR. C*o., 122 Ohio St. 45, 49, 170 N.E. 637 (1930)].

(Emphasis sic.) *Cook v. Matvejs*, 56 Ohio St.2d 234, 237, 383 N.E.2d 601 (1978).

{¶ 57} In sum, " '[a] period of limitations already running may also be shortened by the legislature' as long as 'a period sufficiently long to allow a reasonable time to begin suit' is allowed." *State ex rel. Nickoli v. Erie MetroParks*, 124 Ohio St.3d 449, 2010-Ohio-606, 923 N.E.2d 588, ¶ 29, quoting 1A Sackman, *Nichols on Eminent Domain*, Section 4.102[3], at 4-74 (3d Ed.2006).

{¶ 58} Here, the date of the accrual of the cause of action was only a little over three months before the effective date of the borrowing statute. Granted, the application of the borrowing statute to FRIC's claims in this case reduces the applicable statute of limitations from six years to three. But even with that shortening, there existed a reasonably long period of time for FRIC to file suit. Thus, an application of R.C. 2305.03(B) in this case is not unconstitutionally retroactive.

{¶ 59} With Delaware's statute of limitations controlling this case, FRIC's complaint was filed well outside the applicable statute of limitations. We affirm

the judgment of the court of appeals that FRIC and Cheek are potentially liable under the FDCPA and the OCSPA for threatening to file suit and for filing suit on a time-barred debt, and we remand the case to the trial court for further determinations, including a determination of the effect of our holding on this issue on Taylor Jarvis's claim for abuse of process.

**The Interest Claim**

**{¶ 60}** Taylor Jarvis asserted claims against FRIC and Cheek pursuant to the FDCPA and the OCSPA based on the claim in FRIC's complaint that it was entitled to postjudgment interest in excess of the applicable statutory rate. The trial court granted summary judgment to FRIC and Cheek on the issue, relying primarily on the decision in *Argentieri v. Fisher Landscapes, Inc.*, 15 F.Supp.2d 55 (D.Mass.1998), for the proposition that setting forth a claim in a prayer for relief filed with a court is distinguishable from other conduct in which a debt collector may engage.

**{¶ 61}** In *Argentieri*, the plaintiff in a federal-court action alleged an FDCPA violation based upon a request for attorney's fees that had been made in a state-court complaint in a breach-of-contract action; the plaintiff asserted that the FDCPA was violated because there was no statutory or contractual basis for such an award. *Id.* at 58-59. According to *Argentieri*, a prayer for relief is just a request to the court:

> A prayer for relief in a complaint, even where it specifies the quantity of attorney's fees, is just that: a request to a third party—the court—for consideration, not a demand to the debtor himself. A request for attorney's fees ultimately rests upon the discretion of the court and a determination of applicability at a later stage of the litigation. The whole purpose of regulating debt collection was to "supervise" a range of unsupervised contacts, such as demand letters

and late-night telephone calls. In contrast, a statement in a pleading is supervised by the court and monitored by counsel. The two situations are drastically different.

(Footnote omitted.) *Argentieri* at 61-62.

{¶ 62} We disagree with that statement. A prayer for 24 percent interest is an intimidating statement to a debtor. According to *Argentieri*, such a prayer is "supervised by the court and monitored by counsel." But in a case that is filed with the anticipation of obtaining a default judgment, how much "supervision" of statements in a pleading is actually conducted? In this case, as in many others, there was none. "Unsupervised contacts" by debt collectors are annoyances; demands to a court, on the other hand, have the force of the legal system behind them. Debt collectors borrow the legitimacy of the justice system to back up their claims. "[A] civil filing serves as a credible threat to inflict harm on the defendant" by damaging the defendant's credit rating and thus "may induce the defendant to pay." Hynes, *Broke But Not Bankrupt: Consumer Debt Collection in State Courts*, 60 Fla.L.Rev. 1, 20 (2008). As one court put it,

> an unsophisticated consumer reading the State Court Complaint could be left with the false impression that [the law firm that filed the complaint] was legally entitled to recover an award of attorneys' fees in addition to the amount of the debt allegedly owed. This false impression, in turn, could subtly coerce the consumer to pay the debt out of the fear of incurring even greater liability.

*Samms v. Abrams, Fensterman, Fensterman, Eisman, Formato, Ferrara & Wolf, L.L.P.*, 112 F.Supp.3d 160, 164 (S.D.N.Y.2015).

{¶ 63} Federal courts have held that a court filing is not a safe harbor for debt collectors under the FDCPA. In *Heintz,* 514 U.S. at 294, 115 S.Ct. 1489, 131 L.Ed.2d 395, the United States Supreme Court held that the FDCPA "applies to the litigating activities of lawyers." Relying on that holding, federal "circuit courts have widely recognized that litigation-related conduct, including the filing of formal complaints, can give rise to claims under the Act." *Lipscomb v. The Raddatz Law Firm, P.L.L.C.*, 109 F.Supp.3d 251, 260 (D.D.C.2015).

{¶ 64} In *Kaymark v. Bank of Am., N.A.*, 783 F.3d 168, 177 (3d Cir.2015), the court held that "a communication cannot be uniquely exempted from the FDCPA because it is a formal pleading or, in particular, a complaint." In that case, the consumer, Kaymark, had defaulted on a mortgage held by Bank of America ("BOA"). A law firm representing BOA initiated foreclosure proceedings against the consumer in state court. The foreclosure complaint included an itemized list of total debt, which included $1,650 in attorney's fees that had not yet been incurred at the time of the filing and other allegedly improper fees. *Id.* at 173. Kaymark's subsequent action against BOA and the law firm included a claim that by attempting to collect fees for legal services not yet performed in the mortgage foreclosure, the law firm had violated the FDCPA. *Id* at 174. The court held that "the Foreclosure Complaint conceivably misrepresented the amount of the debt owed, forming a basis for violations of [15 U.S.C.] 1692e(2)(A) and (10)" and that Kaymark had also "sufficiently alleged that [the law firm's] attempt to collect those misrepresented fees was not 'expressly authorized' by the mortgage contract or permitted by law," forming the basis for a violation of 15 U.S.C. 1692f(1). *Kaymark* at 175, quoting 15 U.S.C. 1692f(1). In response to the law firm's argument that pleadings cannot be the basis of FDCPA claims, the court concluded that "the statutory text, as well as the case law interpreting that text, renders this argument meritless." *Id.* at 176.

**{¶ 65}** In *Miljkovic v. Shafritz & Dinkin, P.A.*, 791 F.3d 1291 (11th Cir.2015), the court stated that "because debts are often collected through the judicial process, * * * we think it would 'compel absurd results' indeed if abusive, misleading, or unconscionable documents submitted to a court (and served on the consumer or his counsel) in an attempt to collect on any debt were excluded from the [FDCPA]'s proscriptions." *Id.* at 1303, fn. 8, quoting *Jerman*, 559 U.S. at 600, 130 S.Ct. 1605, 176 L. Ed. 2d 519. The court in *Miljkovic* ultimately determined that the court filing at issue—a reply to the consumer's claim of an exemption from a garnishment action—did not rise to the level of an FDCPA violation. *Id.* at 1306. But as to the broader question, the court stated,

> The statutory text is entirely clear: the FDCPA applies to lawyers and law firms who regularly engage in debt-collection activity, even when that activity involves litigation, and categorically prohibits abusive conduct in the name of debt collection, even when the audience for such conduct is someone other than the consumer.

*Id.* at 1297.

**{¶ 66}** A recent decision of the Sixth Circuit Court of Appeals involved a scenario akin to the present case—the consumer's FDCPA cause of action was based on a debt collector's improper claim for interest on a credit-card debt. In *Stratton v. Portfolio Recovery Assocs.*, 770 F.3d at 445, the court held that a debt collector's improper claim for statutory interest made in a complaint filed in a state trial court could form the basis for a claim by the consumer under the FDCPA. In *Stratton*, the credit-card user, Stratton, had stopped making payments on her credit card; her contract with GE Money Bank ("GE") established an interest rate of 21.99 percent. *Id.* at 446. Once GE determined that the debt was uncollectible, it stopped charging Stratton interest on the debt, for reasons that, according to the federal

circuit court, were "neither irrational or altruistic: By charging off the debt and ceasing to charge interest on it, GE could take a bad-debt tax deduction * * * and could avoid the cost of sending Stratton periodic statements on her account." *Id*. at 445. GE then sold the debt to Portfolio Recovery Associates, L.L.C. ("PRA"). *Id*.

{¶ 67} Two years after buying the debt, PRA filed suit against Stratton, alleging that she " 'owes [PRA] $2,630.95 with interest thereon at the rate of 8% per annum from December 19, 2008[,] until the date of judgment with 12% per annum thereafter until paid, plus court costs.' " *Id*. at 446, quoting PRA's complaint. Kentucky's usury statute sets the legal rate of interest for all loans made in that state at 8 percent unless the parties agree in writing to a higher rate. Ky.Rev.Stat.Ann. 360.010(1). *Stratton* at 445.

{¶ 68} Stratton filed a putative class action against PRA in federal court,

alleging that PRA's attempt to collect 8% interest for the period between the date GE charged off Stratton's debt and the date it sold that debt to PRA violated the FDCPA. In particular, Stratton alleged that the 8% interest was not "expressly authorized by the agreement creating the debt or permitted by law," 15 U.S.C. § 1692f(1), that PRA had falsely represented the "character" of Stratton's debt and the "amount" she owed, § 1692e(2)(A), and that PRA's suit to recover interest it was not owed was a "threat" to take an "action that cannot legally be taken," § 1692e(5).

*Id.* at 446.

{¶ 69} The district court dismissed Stratton's case, concluding that "even an unsophisticated consumer would have understood that the request for interest was just a request, and would not have been misled by it." *Stratton v. Portfolio Recovery Assocs., L.L.C.*, E.D.Ky. No. 5:13-147-DCR, 2013 WL 6191804, *5

(Nov. 26, 2013). Further, the district court held that the state-court collection action did not constitute a threat, but was instead a "lawful vehicle" to recover Stratton's debt. *Id*. at *7.

{¶ 70} The Sixth Circuit reversed, first establishing that the interest sought by PRA in its complaint was not authorized by law. The court found that the 8 percent statutory interest rate was unavailable to PRA because it was unavailable to GE due to the contract GE had negotiated with Stratton:

> GE waived its right to collect contractual interest, a right it had acquired in part by forgoing its right to collect statutory interest. GE gave up the right to collect 8% statutory interest when it had Stratton agree to a 21.99% contractual rate of interest. GE cannot recover the right it bargained away simply because it later chose to waive the right for which it bargained.

*Stratton*, 770 F.3d at 448.

{¶ 71} In *Stratton*, the Sixth Circuit recognized that pursuing the unavailable 8 percent interest rate against the consumer could constitute an FDCPA violation. The court rejected the district court's holding, which had relied on *Argentieri*:

> The district court distinguished "claims made in court from the type of abusive tactics most often invoked under the FDCPA" and saw "no need to invoke the protections" of the Act "when a claim is made to the court," (quoting *Argentieri v. Fisher Landscapes, Inc.,* 15 F.Supp.2d 55, 62 (D.Mass.1998)). Both Supreme Court precedent and the other traditional tools of statutory construction make clear that the district court's understanding of the FDCPA is untenable.

(Footnote omitted.)  *Stratton* at 449.

**{¶ 72}** First, the court noted that the United States Supreme Court recognized in *Heintz* that the FDCPA applies to the litigating activities of lawyers. *Stratton* at 449.  Second, the court pointed out that the FDCPA from its inception "reflected Congressional concern with abusive litigation tactics" through the enactment of 15 U.S.C. 1692i, the FDCPA's "fair venue" provision, which was designed to combat the problem of forum abuse—an unfair practice in which debt collectors seek to obtain default judgments by filing suit in courts so distant or inconvenient that consumers cannot make an appearance.  *Id.* at 449-450.  Third, the *Stratton* court recognized that post-*Heintz* amendments to 15 U.S.C. 1692e specifically exempt formal pleadings only " 'from a sole particularized requirement of the FDCPA: the requirement [in 15 U.S.C. 1692e(11)] that all communications state that they come from a debt collector.' "  *Stratton* at 450, quoting *Sayyed v. Wolpoff & Abramson,* 485 F.3d 226, 231 (4th Cir.2007).  Relying on the Fourth Circuit's reasoning in *Sayyed*, the *Stratton* court determined that formal pleadings are subject to the other provisions of 15 U.S.C. 1692e:

> As the Fourth Circuit explained, "[t]he amendment by its terms in fact suggests that all litigation activities, including formal pleadings are subject to the FDCPA, except to the limited extent that Congress exempted formal pleadings from the particular requirements of § 1692e(11)."

*Stratton*, 770 F.3d at 450, quoting *Sayyed* at 231.  The *Stratton* court concluded, "In sum, absent strong evidence of an exemption, the FDCPA's protections are available wherever unscrupulous debt collection practices might be found—and most certainly in litigation."  *Id.*

**{¶ 73}** Having determined that the filing of a complaint can constitute an FDCPA violation, the *Stratton* court employed the "least sophisticated consumer" test—" 'the usual objective legal standard in consumer protection cases' "—in considering PRA's complaint. *Id.*, quoting *Gionis v. Javitch, Block & Rathbone, L.L.P.,* 238 Fed.Appx. 24, 28 (6th Cir.2007). The *Stratton* court held that "[a]s the drafter of the complaint, PRA 'is responsible for its content and for what the least sophisticated [consumer] would have understood from it.' " *Id.* at 451, quoting *McLaughlin v. Phelan Hallinan & Schmieg, L.L.P.,* 756 F.3d 240, 246 (3d Cir.2014).

**{¶ 74}** Pursuant to that standard, the court found that Stratton had alleged numerous plausible FDCPA violations:

> Because PRA does not have the right to collect interest on Stratton's debt, PRA's allegation to the contrary is a "false representation" of the "character" and "amount" of Stratton's debt. § 1692e(2); *see also Gearing v. Check Brokerage Corp.,* 233 F.3d 469, 472 (7th Cir.2000). PRA's state court suit is an "attempt" to collect an "amount"—$2,630.95 plus 8% interest—that is neither "expressly authorized" by any agreement in the record nor "permitted by law." § 1692f(1). And from the perspective of the least sophisticated consumer it is also a "threat" by PRA "to take action that cannot legally be taken"—namely, to recover 8% interest.

*Id.*

**{¶ 75}** The court in *Stratton* rejected the argument put forth by PRA that its request for statutory interest was merely an aspirational request to the state court, rather than a representation of the legal status of the debt. The court found it significant that PRA had not sought a nonspecific, open-ended amount that the state

32

court might have deemed appropriate, but rather, in the numbered allegations in the complaint had stated, " 'The Defendant(s) *owes* the plaintiff $2,630.95, with interest thereon at the rate of 8% per annum.' " (Emphasis added by the court.) *Id.*, 770 F.3d at 451, quoting the complaint. The court found that "even a sophisticated consumer would read that numbered paragraph from the complaint to be a factual allegation rather than an 'aspirational request.' " *Id.* The court held:

> Thus, PRA's argument fails for two reasons: PRA's allegation was not a "simple request" and there is no protection for a representation that is inaccurate. Saying that Stratton owed $2630.95 plus whatever interest the court chooses to award is simply not the same as saying that Stratton owed $2630.95 plus 8% interest from the date GE charged off her account. PRA averred the latter. It is therefore plausible that PRA's complaint falsely represents both the "character" and "amount" of Stratton's debt. An unsophisticated consumer would most certainly have been misled.

*Id.*

{¶ 76} We agree with the overarching conclusion reached by the court in *Stratton* that both the text and purpose of the FDCPA as well as the reality of the debt-collection industry's pursuit of default judgments as part of its typical collection strategy require the application of the FDCPA to abusive and unfair tactics employed in litigation:

> The FDCPA governs debt collection in or out of court; it does not allow debt collectors to use litigation as a vehicle for abusive and unfair practices that the Act forbids. The district court's [statement that there is " 'no need to invoke the protections' " of the FDCPA

" 'when a claim is made to the court,' " (quoting *Argentieri,* 15 F.Supp.2d at 62)] conflicts with the text and purpose of the FDCPA and ignores the reality of the debt collection business, where "some debt collectors have foregone all meaningful attempts to communicate with debtors and have instead opted to file lawsuits against debtors en masse in an effort to collect enforceable default judgments." Matthew R. Bremner, *The Need for Reform in the Age of Financial Chaos,* 76 Brook. L.Rev. 1553, 1587 (2011); *see also Crawford v. LVNV Funding, LLC,* 758 F.3d 1254, 1256 (11th Cir.2014). * * * By alleging in a complaint that a consumer owes interest that had in fact been waived, a debt collector may be able to secure a default judgment for an amount the consumer does not actually owe. *See Suesz,* 757 F.3d at 639. The FDCPA proscribes such practices.

*Stratton* at 451-452.

**{¶ 77}** Like the debt collector in *Stratton*, FRIC in its complaint sought an interest rate to which it was not entitled. A creditor is limited to interest at the statutory rate unless a written contract provides a different rate of interest, pursuant to R.C. 1343.03(A). *Minster Farmers Coop. Exchange Co., Inc. v. Meyer*, 117 Ohio St.3d 459, 2008-Ohio-1259, 884 N.E.2d 1056, ¶ 25-27. " 'An invoice or monthly statement does not constitute such a writing.' " *Id*. at ¶ 27, quoting *WC Milling, L.L.C. v. Grooms*, 164 Ohio App.3d 45, 2005-Ohio-5420, 841 N.E.2d 324, ¶ 20 (4th Dist.), citing *Yager Materials, Inc. v. Marietta Indus. Ents., Inc.*, 116 Ohio App.3d 233, 235-236, 687 N.E.2d 505 (4th Dist.1996). FRIC filed its complaint and motion for default judgment seeking an interest rate above the maximum statutory rate, but it attached only a billing statement to its complaint to support that rate of interest and did not attach a copy of the credit-card agreement that Taylor

Jarvis had signed. Pursuant to R.C. 1343.03(A), when there is not a written contract the statutory rate is determined by a formula set forth in R.C. 5703.47; in 2010, when the complaint was filed, that rate was 4 percent. *See* http://www.tax.ohio.gov/ohio_individual/individual/interest_rates.aspx.

{¶ 78} As in *Stratton*, the complaint against Taylor Jarvis here alleged that she was required to pay a specific rate of interest; FRIC did not simply request interest at a rate the trial court might deem appropriate. The request is set forth in paragraph three of the complaint:

> Upon information and belief, Plaintiff is owed the charged off sum of $8,765.37, plus accrued interest of $7,738.99, for a total amount owed of $16,504.36, plus future interest at 24.00 % and Defendant(s) is/are in default of his/her/their obligation to pay said balance.

The specificity of the complaint belies the idea that FRIC's claim of entitlement to 24 percent interest was merely an aspirational request to the court rather than a representation of the legal status of the debt.

{¶ 79} FRIC and Cheek rely on *Harvey v. Great Seneca Fin. Corp.*, 453 F.3d 324, 333 (6th Cir.2006), in which the court held that filing a lawsuit to collect a purported debt without the immediate means of proving the existence of the debt does not constitute a violation of the FDCPA. In *Harvey*, the consumer had filed a responsive pleading to a state-court collection complaint and had sought discovery from the debt collector and its attorneys—culminating in the consumer filing a motion to compel—concerning the ownership and amount of the debt. The debt collector did not respond to discovery and dismissed its complaint. The consumer then filed suit in federal court, alleging that the debt collector and its law firm knew that they lacked documentation to prove the existence of the debt for which they

filed a state-court collection action and that the filing of a complaint under those circumstances constituted a deceptive debt-collection practice. *Id.* at 326.

**{¶ 80}** In affirming the district court's dismissal of the consumer's complaint, the Sixth Circuit held that "a debt may be properly pursued in court, even if the debt collector does not yet possess adequate proof of its claim." *Id*. at 333. The court in *Harvey* quoted the reasoning of a federal district court in a similar case:

> "[F]iling a lawsuit supported by the client's affidavit attesting to the existence and amount of a debt * * * is not a false representation about the character or legal status of a debt, nor is it unfair or unconscionable. A defendant in any lawsuit is entitled to request more information or details about a plaintiff's claim, either through formal pleadings challenging a complaint, or through discovery. [The consumer] does not allege that anything in the state court complaint was false, or that the complaint was baseless. She essentially alleges that more of a paper trail should have been in the lawyers' hands or attached to the complaint. The FDCPA imposes no such obligation."

*Harvey* at 331, quoting *Deere v. Javitch, Block, & Rathbone, L.L.P.,* 413 F.Supp.2d 886, 891 (S.D.Ohio 2006).

**{¶ 81}** The court in *Harvey* pointed out that Harvey did not allege in her complaint that the debt collector and its law firm had failed to undertake a reasonable investigation into whether or not Harvey's debt existed; rather, "she essentially focused on the contention" that the debt collector and law firm "did not presently possess the means of proving that debt" when the state-court complaint was filed. *Harvey*, 453 F.3d at 333.

**{¶ 82}** *Harvey* is distinguishable for several reasons. First, the consumer in this case alleges more than the consumer alleged in *Harvey*. Taylor Jarvis's pleading in this case alleged not only that FRIC and Cheek filed a lawsuit against her without possessing at that time of filing the means of proving the debt, but she also alleged that they regularly maintain lawsuits such as the one against her "without the intention or ability to ever obtain evidence" that would establish FRIC's entitlement to interest in excess of the statutory rate. We agree with courts that have found that allegations of this type—regarding the lack of intent to investigate or prove claims on behalf of debt collectors—distinguish cases such as this one from *Harvey*. *See, e.g., Rollins v. Midland Funding, L.L.C.*, E.D.Mo. No. 4:14CV01976 ERW, 2015 WL 3506556, *8 (June 3, 2015), citing *Hinten v. Midland Funding, L.L.C.*, E.D.Mo. No. 2:13CV54 DDN, 2013 WL 5739035, *7 (Oct. 22, 2013), and *Brewer v. LVNV Funding, L.L.C.*, E.D.Mo. No. 4:14CV00942 AGF, 2014 WL 5420274, *2 (Oct. 22, 2014).

**{¶ 83}** Further, FRIC here went far beyond simply filing a complaint without yet having "adequate proof of its claim." *Harvey* at 333. FRIC filed its complaint in March 2010, without including a copy of the credit-card agreement. It quickly sought a default judgment. It did not retreat from the claim for 24 percent interest for which it lacked adequate documentation when it moved for default judgment; instead, it attached an affidavit from a FRIC employee to the motion for default judgment asserting that FRIC was owed "interest at the rate of at least" 24 percent. About two months after filing the complaint, it had a judgment entry awarding it 24 percent postjudgment interest. But it never had the necessary documentation to back up its claim. This was not a mere lack of proof at the first instance of filing. It was a demand for 24 percent interest—unavailable under the law—from a debtor whom it thought would never fight back.

**{¶ 84}** Finally, FRIC lacked more than just a paper trail. FRIC in this case attempted to collect an interest rate that it could not legally collect; only a written

contract could except FRIC from the statutory rate of interest under R.C. 1343.03(A). The existence of a written contract setting forth the interest rate is an essential element of its claim.

**{¶ 85}** There is a clear difference between asserting claims that are recoverable under the law and those that are not. In *Foster v. D.B.S. Collection Agency*, 463 F.Supp.2d 783, 802 (S.D.Ohio 2006), the court found a violation of the FDCPA when a creditor prayed for attorney's fees that were unobtainable pursuant to an Ohio statute. The *Foster* court reasoned that "from the perspective of the 'least sophisticated consumer,' " the prayer for such relief "constitute[d] an absolute entitlement to attorney fees, even though such fees are not recoverable under Ohio law." *Id.*

**{¶ 86}** In this case, from the perspective of the least sophisticated consumer, the prayer for relief claimed entitlement to a rate of interest that was unavailable under the law to FRIC. We affirm the appellate court's decision that Taylor Jarvis established a prima facie case against FRIC and Cheek under the FDCPA and the OCSPA on this issue.

### Liability Under the OCSPA

**{¶ 87}** The court below did not address head-on the question of the applicability of the OCSPA to debt collectors and their attorneys, but instead simply held that Taylor Jarvis had presented viable claims under both the FDCPA and the OCSPA. FRIC and Cheek rely on definitions in R.C. 1345.01(C) and 1345.01(A) to assert that the OCSPA "does not apply to bank assignees and their collection attorneys because there is no 'consumer transaction' or 'supplier.' " We reject their arguments in this regard and agree with Taylor Jarvis's position that debt collectors, including attorneys engaged in debt collections, can be held liable under the OCSPA.

**{¶ 88}** Both the FDCPA and the OCSPA are remedial statutes, intended to reach a broad range of conduct. To state a claim under the FDCPA, a debtor must

establish that a party violated one of the substantive provisions of the act while engaging in debt-collection activity. *Glazer v. Chase Home Fin., L.L.C.,* 704 F.3d 453, 459-460 (6th Cir.2013). 15 U.S.C. 1692e forbids "false, deceptive, or misleading representation[s] or means in connection with the collection of any debt." 15 U.S.C. 1692e(2)(A) prohibits a party from making a "false representation" of the "amount" of any debt. And 15 U.S.C. 1692e(10) prohibits a party from using "false representation or deceptive means to collect or attempt to collect any debt or to obtain information concerning a consumer." For a statement to be actionable, however, it must be "more than just misleading—it 'must be *materially* false or misleading to violate Section 1692e.' " (Emphasis sic.) *Clark v. Lender Processing Servs.*, 562 Fed.Appx. 460, 466 (6th Cir.2014), quoting *Wallace v. Washington Mut. Bank, F.A.,* 683 F.3d 323, 326 (6th Cir.2012). "The materiality standard * * * means that in addition to being technically false, a statement would tend to mislead or confuse the reasonable unsophisticated consumer." *Id.*, citing *Wallace* at 326-327.

{¶ 89} The OCSPA is similar:

> [R.C.] Section 1345.02(A) provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Section 1345.03(A) provides that "[n]o supplier shall commit an unconscionable act or practice in connection with a consumer transaction. Such an unconscionable act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Although the OCSPA does not expressly address debt collection practices, Ohio courts have

applied the OCSPA to such practices. *See Liggins v. May Co.,* 44 Ohio Misc. 81, 337 N.E.2d 816 (Ohio C.P. Cuyahoga County 1975).

*Lewis v. ACB Business Servs., Inc*., 135 F.3d 389, 403 (6th Cir.1998), fn. 11.

**{¶ 90}** The interrelationship between the FDCPA and the OCSPA is established:

"[V]arious violations of the FDCPA constitute a violation of the CSPA. * * * [T]he purpose of both acts is to prohibit both unfair and deceptive acts and this court holds that any violation of any one of the enumerated sections of the FDCPA is necessarily an unfair and deceptive act or practice in violation of R.C. § 1345.02 and/or § 1345.03."

*Kelly v. Montgomery Lynch & Assocs., Inc.,* N.D.Ohio No. 1:07-CV-919, 2008 WL 1775251, *11 (Apr. 15, 2008), quoting *Becker v. Montgomery, Lynch,* N.D.Ohio No. Civ.A. 1:02CV 874, 2003 WL 23335929, *2 (Feb. 26, 2003). *But see Slorp v. Lerner, Sampson & Rothfuss*, 587 Fed.Appx. 249, 260-261 (6th Cir.2014) (cautioning that some conduct that violates the FDCPA may not necessarily constitute a violation of the OCSPA). Thus, it is helpful to further examine the FDCPA as we consider the application of the OCSPA in the context of debt collection by debt buyers and attorneys.

**{¶ 91}** Under the FDCPA, a debt collector is "any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another." 15 U.S.C. 1692a(6). And in *Heintz v. Jenkins*, 514 U.S. at 299, 115 S.Ct. 1489, 131 L.Ed.2d 395, the United States Supreme Court made clear that the

FDCPA applies to "attorneys who 'regularly' engage in consumer-debt-collection activity, even when that activity consists of litigation." *See also Beler v. Blatt, Hasenmiller, Leibsker & Moore, L.L.C.*, 480 F.3d 470, 472 (7th Cir.2007).

**{¶ 92}** Typically, to determine the applicability of the FDCPA to a particular attorney or law firm, the salient question is whether the attorney or law firm regularly engages in consumer-debt-collection activity within the meaning of the act. In answering that question, the focus is on the "regularity" of the collection activities by the attorney and his or her firm.

**{¶ 93}** As the Sixth Circuit recognizes, "[o]rdinary interpretations of the words 'regular' and 'regularly' fail to delineate the amount of debt collection activity required * * * to find an attorney a 'debt collector' under the FDCPA." *Schroyer v. Frankel*, 197 F.3d 1170, 1174 (6th Cir.1999). The Sixth Circuit holds that "for a court to find that an attorney or law firm 'regularly' collects debts for purposes of the FDCPA, a plaintiff must show that the attorney or law firm collects debts as a matter of course for its clients or for some clients, or collects debts as a substantial, but not principal, part of his or its general law practice." *Id*. at 1176.

**{¶ 94}** Despite the Supreme Court's holding in *Heintz* and other reported precedent that makes clear that the FDCPA applies to lawyers and law firms who regularly engage in debt collection as well as to other debt collectors, Cheek and FRIC assert that they are not subject to liability under the OCSPA because they are not "suppliers" within the meaning of R.C. 1345.01(C) and because no "consumer transaction" within the meaning of R.C. 1345.01(A) occurred.

**{¶ 95}** We have little trouble concluding that Cheek and FRIC are "suppliers." As we explained in *Anderson v. Barclay's Capital Real Estate, Inc*., 136 Ohio St.3d 31, 2013-Ohio-1933, 989 N.E.2d 997:

" 'Supplier' means a seller, lessor, assignor, franchisor, or other person engaged in the business of effecting or soliciting

consumer transactions, whether or not the person deals directly with the consumer." R.C. 1345.01(C). The terms "effecting" and "soliciting" are not defined by the statute, so we give the terms their plain and ordinary meanings.

"Effect" is defined as "[t]o bring about; to make happen." *Black's Law Dictionary* at 592 [9th Ed.2009]. "Solicitation" is defined as "[t]he act or an instance of requesting or seeking to obtain something; a request or petition." *Black's* at 1520.

*Id.* at ¶ 29-30.

**{¶ 96}** Both FRIC and Cheek solicited Taylor Jarvis in an effort to effect the recovery of her debt or the resolution of it. They are suppliers within the meaning of the OCSPA. We now turn to the question of whether a "consumer transaction" occurred.

**{¶ 97}** For purposes of the OCSPA, the term "consumer transaction" is defined to mean

a sale, lease, assignment, award by chance, or other transfer of an item of goods, a service, a franchise, or an intangible, to an individual for purposes that are primarily personal, family, or household, or solicitation to supply any of these things. "Consumer transaction" does not include transactions between persons, defined in sections 4905.03 and 5725.01 [financial institution defined] of the Revised Code, and their customers, except for transactions involving a loan made pursuant to sections 1321.35 to 1321.48 of the Revised Code and transactions in connection with residential mortgages between loan officers, mortgage brokers, or nonbank mortgage lenders and their customers; transactions involving a

home construction service contract as defined in section 4722.01 of the Revised Code; transactions between certified public accountants or public accountants and their clients; transactions between attorneys, physicians, or dentists and their clients or patients; and transactions between veterinarians and their patients that pertain to medical treatment but not ancillary services.

R.C. 1345.01(A).

{¶ 98} Relying on this court's decision in *Reagans v. MountainHigh Coachworks, Inc.*, 117 Ohio St.3d 22, 2008-Ohio-271, 881 N.E.2d 245, Cheek asserts that "the definition of 'consumer transaction' explicitly and specifically excludes transactions between financial institutions and their customers," and that the exemption extends to "bank assignees," which Cheek contends includes both FRIC and Cheek. We disagree.

{¶ 99} *Reagans* is wholly distinguishable from this case. That case involved litigation brought by plaintiffs against the seller and the manufacturer of their motor home, which the plaintiffs claimed was defective. The plaintiffs sought recovery under various causes of action, including alleging a violation of the OCSPA. *Id*. at ¶ 1. The plaintiffs also alleged that the bank that loaned them the money for the purchase was derivatively liable for their claims against the seller. *Id*.

{¶ 100} In addressing that claim, we held that a bank cannot be held derivatively liable pursuant to a Federal Trade Commission ("FTC") regulation or rule for an award of treble damages and attorney's fees against a seller of goods under the OCSPA. *Id*. at ¶ 2-3. Our analysis was driven, in part, by the recognition that transactions between financial institutions and their customers are exempted from the definition of a "consumer transaction" within the meaning of R.C. 1345.01(A) of the OCSPA. *Id*. at ¶ 33. *See also Jackson v. Sunnyside Toyota, Inc*.,

175 Ohio App.3d 370, 2008-Ohio-687, 887 N.E.2d 370, ¶ 7 (8th Dist.) (" 'Consumer transactions' do not include transactions between 'financial institutions' and their customers. See R.C. 1345.01(A) and 5725.01(A)"). That exemption shielded the bank from direct liability and permitted derivative liability only to the extent that the FTC required derivative liability. *Reagans* at ¶ 33.

**{¶ 101}** Here, Cheek asserts that because Chase (which we will presume for purposes of this case to be an exempt "financial institution" within the meaning of the OCSPA) would be shielded from OCSPA liability for its own attempts to collect the debt from Taylor Jarvis, Cheek is similarly exempt because it was attempting to collect the debt on behalf of FRIC, which purchased the debt that had been owed to Chase. We do not agree.

**{¶ 102}** Neither FRIC nor Cheek is a financial institution within the meaning of the OCSPA. As amicus curiae the state of Ohio correctly argues, the exemption for banks and financial institutions applies only to transactions with certain specific entities, namely, banks and financial institutions as defined by R.C. 1345.01(A) and 5725.01. Cheek fails to establish that those statutes, or any other statutes in the Revised Code, confer an exemption on FRIC, a debt buyer that purchased a debt that originated in a transaction involving an exempt financial institution, or on Cheek merely because it contracted with and represented a debt buyer. And we reject any notion that a debt collector and its attorneys can be permitted "derivative use" of the financial-institution exemption in the OCSPA based solely on the fact that the debt at issue originated between a financial institution and a consumer. *See Foster*, 463 F.Supp.2d at 783, fn. 42 (rejecting a nonphysician debt collector and its attorney's invocation of the exemption in the OCSPA that applies to physicians regarding their attempts to collect debts arising from patient-physician health-care transactions); *Kline v. Mtge. Electronic Registration Sys., Inc.*, S.D.Ohio No. 3:08cv408, 2010 WL 1267809, *5 (Mar. 30,

2010) (holding that the financial-institution exemption in the OCSPA applies to national banks and not to subsidiaries of those banks).

{¶ 103} Cheek additionally asserts that our decision in *Anderson*, 136 Ohio St.3d 31, 2013-Ohio-1933, 989 N.E.2d 997, supports that no "consumer transaction" on which to base an OCSPA action occurred in this case. FRIC presents arguments on this point that also rely heavily on *Anderson*. But *Anderson* is inapposite here.

{¶ 104} *Anderson* arose from interactions between mortgage-service providers and homeowners. We held that the OCSPA did not apply to the mortgage-service providers for three key reasons not presented here.

{¶ 105} First, in *Anderson* we held that because "[m]ortgage servicing is a contractual agreement between the mortgage servicer and the financial institution that owns both the note and mortgage," there was no "consumer" transaction within the meaning of the OCSPA. *Id*. at ¶ 12-13. Second, we recognized that land transactions are frequently regulated by specialized legislation and thus are excluded from the Uniform Consumer Sales Practices Act, on which the OCSPA is modeled. *Id*. at ¶ 18. And third, we found that that the legislative history of the OCSPA amply demonstrated that the General Assembly did not intend for the OCSPA to apply to mortgage-service providers. *Id*. at ¶ 20-25.

{¶ 106} None of the factors that were critical to our analysis in *Anderson* is present here. We therefore reject Cheek's and FRIC's arguments that debt collectors and their attorneys are exempt from the OCSPA.

## CONCLUSION

{¶ 107} We hold that Ohio's borrowing statute applies in this case and that therefore, Delaware's statute of limitations applied to FRIC's debt-collection action against Taylor Jarvis. We further hold that FRIC's complaint against Taylor Jarvis was time-barred and that the filing of a time-barred collection action may form the basis of violations under the FDCPA and the OCSPA. We also hold that FRIC's

claim in its complaint for interest that is unavailable by law was a demand made upon Taylor Jarvis rather than an aspirational request to the trial court and thus can be the basis of an actionable claim under the FDCPA and the OCSPA. We remand the case to the trial court for a determination of those causes of action, including a consideration of whether the FDCPA's bona fide error defense is applicable, and for a determination of the cause of action for abuse of process. Finally, we hold that debt buyers collecting on credit-card debt and their attorneys are subject to the OCSPA.

{¶ 108} Accordingly, we affirm the judgment of the court of appeals that reversed the trial court's granting of FRIC's and Cheek's motions for summary judgment and remand the cause to the trial court for further proceedings consistent with this opinion.

Judgment affirmed
and cause remanded.

O'NEILL, J., concurs.

LANZINGER, J., concurs in judgment only.

KENNEDY, J., concurs in part and concurs in the judgment in an opinion that O'DONNELL, J., joins.

O'CONNOR, C.J., dissents in an opinion that FRENCH, J., joins.

_____

**KENNEDY, J., concurring**.

{¶ 109} I agree with most of the opinion of the court. While I agree with the ultimate conclusion that the action brought against Sandra Taylor Jarvis was untimely, I disagree with the analysis regarding when the cause of action against her accrued. Because a credit-card account is an account founded upon contract, with a single and indivisible liability arising from individual transactions that are connected as a series, the issue of when the cause of action accrued is resolved by case law regarding an action on an account. The statute of limitations for an action

on an account begins to run on the date of the last item appearing on the account. Applying these principles to the facts before us, I would hold that the cause of action accrued on June 28, 2006, the date Taylor Jarvis made her last payment on the credit-card account.

{¶ 110} The lead opinion reasons that when a credit-card debtor fails to make an agreed-to monthly minimum payment when it becomes due and owing, a cause of action accrues for statute-of-limitations purposes. Lead opinion at ¶ 50, citing *Dudek v. Thomas & Thomas Attorneys & Counselors at Law, L.L.C.*, 702 F.Supp.2d 826, 839 (N.D.Ohio 2010); *Citibank, N.A. v. Hyslop*, 10th Dist. Franklin No. 12AP-885, 2014-Ohio-844, ¶ 16-17; *Discover Bank v. Heinz*, 10th Dist. Franklin No. 08AP-1001, 2009-Ohio-2850, ¶ 17; *Discover Bank v. Poling*, 10th Dist. Franklin No. 04AP-1117, 2005-Ohio-1543, ¶ 18. However, none of the cases relied upon by the lead opinion engaged in any analysis on the issue of accrual, and none of them concluded that the due date of the first missed monthly minimum payment is the date on which a cause of action accrues.

{¶ 111} In *Dudek,* there was no dispute as to the date that the creditor's breach-of-contract claim accrued against the debtor. *Dudek* at 839. The court accepted the undisputed date and did not engage in any independent analysis to resolve the issue of when the cause of action accrued. *Id.*

{¶ 112} *Hyslop* is also devoid of any discussion of when the cause of action accrued. Instead, the *Hyslop* court noted that the credit-card-account billing statements in evidence reflected activity beginning September 30, 2009, and continuing through September 5, 2011. *Hyslop* at ¶ 12. An employee of the bank had stated in an affidavit that the debtor was in default for his failure to make "proper payments" on the account. *Id.* at ¶ 13. The appellate court did not address any issue regarding the statute of limitations and agreed with the trial court that the bank had established that the debtor had failed to make required payments and that the account was in default. *Id.* at ¶ 16-20.

**{¶ 113}** The analysis in *Poling* focused on whether the bank had proved a breach-of-contract claim for the debtor's alleged failure to make payments on a credit-card account. *Poling*, 2005-Ohio-1543, at ¶ 17. The court concluded that the bank had established a breach of contract, and the court stated that the "defendant repeatedly failed to make the minimum monthly payment due on the account, and, therefore, was in default." *Id.* at ¶ 18. The court never discussed the accrual date for the cause of action.

**{¶ 114}** In *Heinz*, no issue was raised regarding the date that the cause of action accrued. The court noted that after applying for and receiving the credit card, the debtor made a balance transfer, purchased some goods and services with the card, and "made payments on the account until November 2007, when she sent a letter to [the creditor] contending she was not required to pay any amounts due on the account." *Heinz*, 2009-Ohio-2850, at ¶ 4. In concluding that the debtor had failed to demonstrate a meritorious defense to the creditor's breach-of-contract claim, the *Heinz* court noted that after November 2007, the debtor "failed to make any required minimum monthly payments due on her * * * card account and therefore was in 'default.' " *Id.* at ¶ 17.

**{¶ 115}** The facts currently before this court are also different from the underlying facts in *Dudek, Hyslop, Heinz*, and *Poling*. While Taylor Jarvis failed to make the scheduled minimum monthly payment due in January 2005, Chase did not inform her that it had suspended her charging privileges until it sent her the billing statement for the payment due on May 2, 2005. Taylor Jarvis also continued to make a number of less-than-minimum monthly payments until June 28, 2006. There are no indications in any of the aforementioned cases that the creditors had continued to extend credit after the debtors had failed to make less-than-minimum monthly payments or that the debtors made less-than-minimum payments on the accounts that were accepted by the creditors after the debtors had failed to make a minimum payment due. Based upon these factual differences and the lack of a

discussion of the date the cause of action accrued in any of the cases the lead opinion cites, the cases relied upon by the lead opinion are unavailing.

{¶ 116} Rather, case law pertaining to an action on an account guides the determination of when the cause of action accrues for statute-of-limitations purposes. An action on an account is founded upon contract, *Arthur v. Parenteau*, 102 Ohio App.3d 302, 304, 657 N.E.2d 284 (3d Dist.1995), and "is appropriate where the parties have conducted a series of transactions for which a balance remains to be paid," *Blanchester Lumber & Supply, Inc. v. Coleman*, 69 Ohio App.3d 263, 265, 590 N.E.2d 770 (12th Dist.1990). Courts in Ohio recognize a creditor's ability to pursue an action on an account for a cardholder's default on a credit-card account. *See Ohio Receivables, L.L.C. v. Dallariva,* 10th Dist. Franklin No. 11AP-951, 2012-Ohio-3165, ¶ 30-34; *Citibank, N.A. v. Eckmeyer*, 11th Dist. Portage No. 2008-P-0069, 2009-Ohio-2435, ¶ 15. Further, the General Assembly has defined "account" to include "a right to payment of a monetary obligation, whether or not earned by performance, * * * arising out of the use of a credit or charge card or information contained on or for use with the card." R.C. 1309.102(A)(2)(a)(vii).

{¶ 117} An Indiana court of appeals engaged in a thorough analysis of a credit-card account that is instructive here. *Smither v. Asset Acceptance, L.L.C.,* 919 N.E.2d 1153, 1160 (Ind.App.2010). The *Smither* court distinguished credit-card accounts from promissory notes and installment loans, which have a "total amount of indebtedness and a defined schedule of repayment, including precise dates for payment and the amount of each payment until the debt is fully repaid, typically * * * included in the loan document from the outset." *Id.* at 1159. In contrast,

> the precise amount of debt that a consumer may undertake [on a credit-card account] is unknown at the outset and fluctuates,

depending on how the card is used.  * * *  [T]he creditor sends monthly statements to the debtor indicating the amount of that month's required minimum payment, which may vary depending upon how much the card has been used, whether the creditor has imposed fees of different kinds, whether the interest rate for the card is variable, and how previous payments have been made.

*Id.*

{¶ 118} The *Smither* court concluded that a credit-card account is analogous to an "open account," which

"results where the parties intend that the individual transactions in the account be considered as a connected series, rather than as independent of each other, subject to a shifting balance as additional debits and credits are made, until one of the parties wishes to settle and close the account, and where there is but one single and indivisible liability arising from such series of related and reciprocal debits and credits."

*Id.*, quoting 1 American Jurisprudence 2d, Accounts and Accounting, Section 4, at 263-264 (2005) (footnotes omitted).

{¶ 119} The *Smither* court held that a credit-card debt is "an open account debt for statute of limitations purposes."  919 N.E.2d at 1160.  It determined that the statute of limitations for such an account begins to run on the date of the last activity on the account.  *Id.* ("Whether we consider the statute of limitations to have begun running on the date of Smither's last payment or the next payment due date thereafter, Asset's lawsuit filed on May 30, 2006, was more than six years after both dates").

{¶ 120} Turning to the current case, the last activity on the account was a $50 payment by Taylor Jarvis on June 28, 2006, which qualifies as the last item on the account. Taylor Jarvis tendered the payment, and Chase accepted it, with the understanding that Chase would apply the payment to adjust the balance due on the account. Therefore, I would find that the cause of action against Taylor Jarvis accrued, and the statute of limitations began to run, on June 28, 2006. As such, the cause of action accrued after April 7, 2005, the effective date of the borrowing statute, R.C. 2305.03(B), and that statute applies in the circumstances here, meaning that Delaware's statute of limitations controls and that the suit against Taylor Jarvis was untimely. It is therefore not necessary to determine, as the lead opinion does, whether R.C. 2305.03(B) applies to causes of action that accrued but were not commenced before its effective date.

{¶ 121} Even if the analysis focusing on Taylor Jarvis's last payment on the account is rejected, the lead opinion's conclusion that the cause of action accrued when Taylor Jarvis failed to make a minimum monthly payment is problematic. Chase obviously did not conclude that this failure rendered the parties' credit relationship irreparable. Instead, Chase continued to extend charging privileges to Taylor Jarvis. It was not until Chase terminated Taylor Jarvis's charging privileges that the credit relationship between the parties came to end. The First District Court of Appeal of California has concluded that the relevant date for determining when a cause of action accrues for statute-of-limitations purposes on an open account is "the date the debt becomes settled; i.e., the date the relationship between the parties has come to an end other than for purposes of paying amounts due or past due." *R.N.C., Inc. v. Tsegeletos,* 231 Cal.App.3d 967, 975, 283 Cal.Rptr. 48 (1991). Applying this alternative analysis, the cause of action against Taylor Jarvis accrued, and the statute of limitations began to run, at the very earliest on April 8, 2005, the day after the last day of the billing cycle that closed before Chase terminated Taylor Jarvis's charging privileges. As such, the borrowing statute applies under this

analysis as well, Delaware's statute of limitations controls, and the suit against Taylor Jarvis was untimely.  And, again, it is therefore not necessary to determine, as the lead opinion does, whether R.C. 2305.03(B) applies to causes of action that accrued but were not commenced before its effective date.

{¶ 122} Accordingly, I respectfully concur.

O'DONNELL, J., concurs in the foregoing opinion.

_____

**O'CONNOR, C.J., dissenting.**

{¶ 123} This appeal illustrates the nexus of complex financial, social, and legal phenomena that have arisen in the wake of what is commonly called the Great Recession (generally considered to have been most severe in this country from December 2007 through June 2009), which left many Americans with decreased net worth and engendered the longest periods of unemployment since the World War II era. *See generally* Warner, *What the Great Recession Has Done to Family Life,* New York Times Magazine (Aug. 6, 2010), available at http://www.nytimes.com/2010/08/08/magazine/08FOB-wwln-t.html?_r=2&ref=magazine& (accessed May 12, 2016); *see also Jobless Debt Is Heavy*, Columbus Dispatch (Aug. 13, 2014), available at http://www.dispatch.com/content/stories/editorials/2014/08/13/jobless-debt-is-heavy.html (accessed May 12, 2016).  Not surprisingly, many Americans incurred debts that they were unable—or perhaps unwilling—to pay.  The decedent in this case appears to be one such American, but the record before us does not establish why her debts were not paid.[2]

---

[2] "[A]lthough '*de mortuis nil nisi bonum*,' be a maxim of our profession, the memory of the deceased has not been spared." *Pierson v. Post*, 3 Caines 175, 180, 2 Am.Dec. 264, 1805 WL 781 (N.Y.1805) (Livingston, J., dissenting) (using a Latin phrase that has been translated as "(say) nothing but good of the dead," *Webster's New World Dictionary* 367 (3d College Ed.1988)).  As the majority notes, the decedent, Sandra Taylor Jarvis, died during the pendency of this appeal.  She may have been the victim of poor health, but we cannot assume that her ill health was the reason she failed to make payments on the credit-card account at issue in this case or that she was the gullible victim of debt

{¶ 124} The amounts of unpaid debt in the United States are staggering. In 2008, credit card lenders "wrote off" about $45 billion in bad debt. Dash and Martin, *Banks Brace for Credit Card Write-Offs,* New York Times, May 10, 2009, available at http://www.nytimes.com/2009/05/11/business/11credit.html?_r=0 (accessed May 19, 2016). As troubling as that number is, financial institutions charged off about $20 billion *each quarter* from early 2009 through early 2010. Hauser, *Bank Losses Lead to Drop in Credit Card Debt,* New York Times, Sept. 24, 2010, available at http://www.nytimes.com/2010/09/25/business/25credit.html (accessed May 19, 2016).

{¶ 125} Terms such as "write-off" and "charge-off" are based on accounting principles and are used to describe the situation in which a creditor has determined that a debt is unlikely to be paid, usually after 180 days without payment, and "charges off" the account receivable as uncollectable. Fox, *Do We Have A Debt Collection Crisis? Some Cautionary Tales of Debt Collection in Indiana*, 24 Loy.Consumer L.Rev. 355, 358 (2012), fn. 16; Haneman, *The Ethical Exploitation of the Unrepresented Consumer*, 73 Mo.L.Rev. 707, 713 (2008). The real debt, however, does not magically disappear. The companies owed the debt suffer the loss of that money, and ultimately they shift the burden of paying the debt to other credit-card holders through higher interest rates and fees. Fox at 362. And there are plenty of credit-card holders bearing that burden. In 2015, the average American household carried about $5,700 in credit-card debt; about 38 percent of households carried an average debt that was more than $15,000. Gabler, *The Secret*

---

collectors. The decedent stated in an affidavit that appears in the record of this case that she worked in a supervisory capacity in a bankruptcy trustee's office for more than a decade and affirmatively stated that she had a considerable degree of familiarity with the law and legal processes. And although she alleged that she became disabled after suffering a serious stroke on February 5, 2010, that date was well after the cause of action accrued in this case, as well as in others in which she apparently defaulted on credit-card debt accumulated on other credit cards. *See, e.g., Capital One Bank v. Jarvis*, Cuyahoga Falls M.C. No. 2004CVF03902 (Feb. 8, 2005) (entering judgment of $12,495.27 plus interest).

*Shame of Middle-Class Americans,* The Atlantic (May 2016), available at http://www.theatlantic.com/magazine/archive/2016/05/my-secret-shame/476415/ (accessed May 19, 2016). Although the number of people holding credit-card debt has been decreasing over the last few years, notably, the average debt for those households that do carry a balance has been on the rise. *Id.* In a sense then, credit-card companies are charging those people for both the costs they incur as they attempt to pay off their debts and the costs that others incurred but were unable to pay.

**{¶ 126}** Companies also engage in the sometimes unsavory, but now common, phenomenon of "debt sales" in which a creditor sells an individual's debt, for pennies on the dollar, to a private entity that then attempts to collect the debt, often through the court process. And the collection efforts include efforts to collect "charged-off" debts:

> To recoup a portion of its lost investment, an originating lender may sell a charged-off consumer loan to a Debt Buyer, usually as part of a portfolio of delinquent consumer loans, for a fraction of the total amount owed to the originating lender. * * * Once a Debt Buyer has purchased a portfolio of defaulted consumer loans, it may engage in collection efforts (or hire a third-party to do so), which may include locating borrowers, determining whether borrowers are in bankruptcy, commencing legal proceedings, or "otherwise encouraging" payment of all or a portion of the delinquency.

*Debt Buyers' Assn. v. Snow,* 481 F.Supp.2d 1, 4 (D.D.C.2006), quoting a memorandum filed in the case.

**{¶ 127}** It is undisputable that some debt collectors, whether first party or third party, act unlawfully and unconscionably in the process of attempting to collect the debt. The majority raises valid criticisms of those debt purchasers who "reap staggering profits by methodically cleaning financial carcasses left abandoned" years ago. Haneman, 73 Mo.L.Rev. at 713.

**{¶ 128}** But the majority's characterization of the debt market ignores the reality that there would be no debt to purchase if there had not been so many defaults on debts. In fact, there is plenty of blame to go around.

**{¶ 129}** The Federal Trade Commission's ("FTC") recent report of the results of a landmark study of the debt-purchasing industry, upon which the majority relies heavily, analyzed more than 5,000 debt portfolios purchased by large debt buyers in a three-year study period ending in June 2009. *The Structure and Practices of the Debt Buying Industry* ii, A-1 (Jan. 2013), available at http://www.ftc.gov/sites/default/files/documents/reports/structure-and-practices-debt-buying-industry/debtbuyingreport.pdf (accessed May 19, 2016) ("*Structure and Practices*"). Those portfolios contained nearly 90 million consumer accounts that had a face value of $143 billion. *Id.* at ii. Sixty-two percent of that debt was credit-card debt. *Id.*

**{¶ 130}** The study makes clear that information received by debt purchasers, including information about whether the consumer had ever disputed the debt, is deficient in many ways. *Id.* at ii-iii. Yet only 3.2 percent of the consumers whose debt was purchased disputed the debts, and the debts in more than half of those cases were verified by the debt buyer. *Id.* at iv. Debt-purchasing companies resold only 2.9 percent of their disputed debts and only 0.8 percent of their unverified disputed debts. *Id.* Thus, although some debt buyers undoubtedly bought disputed debts, the vast majority of them did not.

**{¶ 131}** Similarly, although some debt buyers involved in the study purchased and attempted to collect debts that were more than six years old, the FTC

also found that "most of the debt that [debt buyers] purchased did not appear to be either old or beyond the statute of limitations." *Id.* at v.

{¶ 132} And, for better or worse, the FTC acknowledged that debt buying can reduce creditors' losses and thereby allow for more credit to be provided to consumers at better rates. *Id.* at i.

{¶ 133} Much more could be said about the business of debt buying, but for now, it suffices for two things to be made clear. First, the debt market involves both the bad behaviors of irresponsible consumers and the tragedies of responsible ones. Second, despite the majority's recitation of the misdeeds of debt collectors and its broad-brush imputation of those misdeeds to the industry as a whole, nothing in the record before us establishes that these appellants—Cheek Law Offices, L.L.C., and attorney Parri Hockenberry (collectively "Cheek"), First Resolution Investment Corporation ("FRIC"), and First Resolution Management Corporation—necessarily acted wrongly in seeking to collect an established debt.

{¶ 134} I understand the majority's indignation with perceived injustices, but I cannot join its analysis, which is driven by the result it seeks to achieve rather than thoughtful considerations of precedent and public policy. And therein lies the rub: the majority's grandiose statements and holdings, though intended to protect Ohio's consumers, portend great harm to them and to the vitally important plaintiffs' bar—the holdings will inevitably be applied as precedent in future cases in ways that will not be consumer friendly.

{¶ 135} I dissent.

{¶ 136} The proper analysis of the claims in this case should lead to the conclusion that Ohio law controls both the substantive and procedural aspects involved. I would hold that under Ohio law, the complaint was timely filed and therefore that appellants did not violate the Ohio Consumer Sales Practices Act ("OCSPA"), R.C. 1345.01 et seq., or the federal Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. 1692 et seq., by bringing a time-barred suit against the

decedent. I would also hold that appellants did not violate the OCSPA or the FDCPA by requesting the rate of interest in the prayer for relief in the complaint against the decedent that they sought. I would reverse the judgment of the court of appeals and enter judgment in favor of appellants, as the trial court did.

## ANALYSIS

{¶ 137} As the trial court recognized early in these proceedings, the outcome in this case turns on whether the procedural and substantive law of Ohio or another state controls.

**Ohio Procedural Law Controls**

*Ohio's procedural law on statutes of limitations*

{¶ 138} The key to the majority's holding in favor of the decedent's estate is that Ohio's borrowing statute, R.C. 2305.05, applies in this case. It does not.

{¶ 139} It is well settled in Ohio that the forum state's statutes of limitations are to be applied in *the forum*, which, here, is Ohio. "The matter of the statute of limitations being a question of remedy, it is universally considered to be governed by the law of the forum." *McCormick v. Taft*, 61 Ohio App. 200, 201, 22 N.E.2d 510 (1st Dist.1938). Because the forum for the underlying suit is a court in Ohio, Ohio law controls the statute-of-limitations question.[3] *See, e.g., Kerper v. Wood*,

---

[3] Because substantive law is not at issue, neither *Gries Sports Ents., Inc. v. Modell,* 15 Ohio St.3d 284, 473 N.E.2d 807 (1984), nor 1 Restatement of the Law 2d, Conflict of Laws, Section 188 (1971), applies to the statute-of-limitations question in this case, *Resner v. Owners Ins. Co.*, 3d Dist. Allen No. CA 2001 0091, 2002 WL 236970, *1 (Feb. 14, 2002), and the appellate court's analysis of the issue was incorrect. Instead, 1 Restatement of the Law 2d, Conflict of Laws, Section 142(2) (1971), governs the resolution of conflicts over which state's statute of limitations applies. *Unifund CCR Partners Assignee of Palisades Collection, L.L.C. v. Childs*, 2d Dist. Montgomery No. 23161, 2010-Ohio-746, ¶ 15; *see also Lewis v. Steinreich*, 73 Ohio St.3d 299, 303, 652 N.E.2d 981 (1995), citing *Morgan v. Biro Mfg. Co., Inc.*, 15 Ohio St.3d 339, 474 N.E.2d 286, 288-289 (1984). As the Sixth Circuit has explained:

> When a conflict arises between two states' statutes of limitations, the Restatement provides: ["]An action will be maintained if it is not barred by the statute of limitations of the forum, even though it would be barred by the statute of limitations of another state.["] Restatement (Second) of Conflict of Laws § 142(2). Section 142(2) thus requires Ohio courts to apply Ohio's statute of

48 Ohio St. 613, 622, 29 N.E. 501 (1891) ("Statutes of limitation relate to the remedy, and are, and must be, governed by the law of the forum; for it is conceded that a court which has power to say when its doors shall be opened has also power to say when they shall be closed"). *See also Alropa Corp. v. Kirchwehm,* 138 Ohio St. 30, 33 N.E.2d 655 (1941), paragraph one of the syllabus ("The validity and interpretation of a contract are governed by the laws of the state where such contract is made or is to be performed; but the remedies are governed by the laws of the state where the suit is brought. The limitation of actions relates to the remedy"); *Unifund CCR Partners Assignee of Palisades Collection, L.L.C. v. Childs*, 2d Dist. Montgomery No. 23161, 2010-Ohio-746, ¶ 14 (" 'In choice-of-law situations, the procedural laws of the forum state, including applicable statutes of limitations, are generally applied' "), quoting *Lawson v. Valve-Trol Co.*, 81 Ohio App.3d 1, 4, 610 N.E.2d 425 (9th Dist.1991), citing *Howard v. Allen*, 30 Ohio St.2d 130, 283 N.E.2d 167 (1972); *D.A.N. Joint Venture III, L.P. v. Armstrong*, 11th Dist. Lake No. 2006-L-089, 2007-Ohio-898, ¶ 28 (Ohio courts have consistently and uniformly held that limitations of actions are fixed by the laws of the state in which suit is filed); *Combs v. Internatl. Ins. Co.*, 354 F.3d 568, 577 (6th Cir.2004) (a federal court sitting in

---

limitations to breach of contract actions brought in Ohio, even if the action would be time-barred in another state. *See Males v. W.E. Gates & Associates*, 29 Ohio Misc.2d 13, 504 N.E.2d 494, 494-95 (Ohio Com.Pl.1985) (applying Ohio's fifteen-year statute of limitations to a breach of contract action that would have been barred by Virginia's five-year statute); *cf. Mahalsky v. Salem Tool Co.*, 461 F.2d 581, 586 (6th Cir.1972) (holding this rule does not deny full faith and credit); *Mackey v. Judy's Foods, Inc.*, 867 F.2d 325, 328-29 (6th Cir.1989) (affirming the district court's application of a similar rule in Tennessee).

*Cole v. Mileti*, 133 F.3d 433, 437 (6th Cir.1998), citing *Charash v. Oberlin College,* 14 F.3d 291, 299 (6th Cir.1994). In so concluding, I recognize that Section 142 of the Restatement was revised in 1988, *see* 1 Restatement of the Law 2d, Conflict of Laws, Section 142 (1988), but the courts of our state have declined to adopt the revised version. *See Dudek v. Thomas & Thomas Attorneys & Counselors at Law, L.L.C.*, 702 F.Supp.2d 826, 834 (N.D.Ohio 2010), fn. 8 (stating that Ohio courts have continued to apply the original version of Section 142). I agree that the 1971 version of Section 142 is applicable here.

diversity must apply the procedural law of the forum state, including the forum state's statute of limitations).

{¶ 140} The majority pays lip service to these principles, but it meanders through a muddied analysis that obfuscates the law for debtor and creditor alike so that it can hold that Delaware's statute of limitations applies. The majority accordingly reaches the outcome desired by both it and the decedent's estate: that FRIC's claims were time-barred when it filed its complaint against the decedent.

*Application of the borrowing statute*

{¶ 141} For R.C. 2305.03(B) to apply here, there necessarily must first be a finding that the cause of action accrued in a different jurisdiction than Ohio. *See Combs v. Internatl. Ins. Co.*, 163 F.Supp.2d 686, 691 (E.D.Ky.2001) ("borrowing statute is triggered only when the cause of action *accrued* in another jurisdiction" [emphasis sic]), *aff'd*, 354 F.3d 568 (6th Cir.2004). The trial court in this case was presented with conflicting arguments on that point and found little controlling case law. Ultimately, it found the holdings by the federal trial and appellate courts in *Combs* to be "most persuasive in assisting this Court in its determination of where the present case 'accrued.' "

{¶ 142} In *Combs*, a federal trial court applying Kentucky law in a diversity case was confronted with a choice-of-law accrual question in a dispute involving the alleged breach of an insurance contract. In a thorough analysis, that court concluded that a cause of action for payment of money allegedly due accrues where the decision to deny payment was made. 163 F.Supp.2d at 692-695.

{¶ 143} Applying *Combs*, the trial court in this case held that the breach occurred in Ohio because the decedent made the decision not to make her payments while she was in Ohio:

> The Court finds that Ohio, where [the decedent] resides, primarily
> used the credit card, and decided to stop making the minimum

required payments on her credit card, was where the breach of the agreement occurred. The fact that [the decedent] was required to mail payments to Delaware does not determine *where* the breach occurred—or where the action accrued. There is evidence that, for some period of time, [the decedent] was mailing payments to Illinois, rather than Delaware. She could have also chosen to make her payments on the Internet, by telephone, or to a Chase bank branch. The location where she sent her payments seems less significant in this case than the place where [the decedent] decided to stop making payments. In summary, the Court finds that [FRIC's] actions accrued in Ohio. For this reason, the Court finds that Ohio's statute of limitations applies to the present case.

(Emphasis sic.)

{¶ 144} I agree with the trial court's approach—which is grounded in law and common sense—that the location where the debtor lives, primarily uses the card, and decides not to make the payments is more significant to the breach than the place where payments would have been sent if there had been no breach. *See, e.g., Combs*, 163 F.Supp.2d at 692-695. Because I would find the cause of action accrued in Ohio, I would hold that the borrowing statute is inapplicable here.

{¶ 145} Conversely, the majority's view, in essence, is that Ohio consumers who are solicited with credit-card applications in Ohio, complete the applications in Ohio and mail the applications from Ohio, then receive the credit cards in Ohio and use the credit cards in Ohio, nevertheless would be better served by having the law of Delaware—or whichever state they mailed their payments to—apply to any claims arising from the credit-card agreements.

{¶ 146} Notably, however, the place where a creditor is incorporated or requests to receive its payments should not be controlling, given that "Congress'

purpose in passing the FDCPA was 'to prevent debt collectors from bringing collection suits in forums located at great distances from debtors' residences.' " *Harrington v. CACV of Colorado, L.L.C.*, 508 F.Supp.2d 128, 134 (D.Mass.2007), quoting *Dutton v. Wolhar,* 809 F.Supp. 1130, 1139 (D.Del.1992), citing S.Rep. No. 95-382, at 5, reprinted in 1977 U.S.Code Cong. & Adm.News 1695, 1699. And the borrowing statute was designed to prevent a plaintiff from forum shopping when the plaintiff's claims have expired, *Miami Valley Mobile Health Servs., Inc. v. ExamOne Worldwide, Inc.*, 852 F.Supp.2d 925, 932 (S.D.Ohio 2012).

**{¶ 147}** As the majority acknowledges, Ohio's borrowing statute, in essence, "directs a forum court to 'borrow' the limitation period of another state if the cause of action accrued in that foreign state and that state's limitation period is shorter than the forum state's limitation period." Majority opinion at 37, citing *Dudek v. Thomas & Thomas Attorneys & Counselors at Law, L.L.C.*, 702 F.Supp.2d 826, 835 (N.D.Ohio 2010), citing *Combs*, 354 F.3d at 578, and *CMACO Automotive Sys., Inc. v. Wanxiang Am. Corp.*, 589 F.3d 235, 244 (6th Cir.2009).

**{¶ 148}** The better-reasoned analysis of precedent mandates a determination that the cause of action in this case accrued in Ohio, because an Ohio consumer executed a contract for a credit card in Ohio, made purchases with that card in Ohio, and defaulted on the debt in Ohio. As one court explained in considering a choice-of-law dispute involving a Chase credit card issued to an employee of an Ohio corporation, because the credit-card agreement "was applied for and signed in Ohio and, as the card was used by an Ohio corporation, its primary effect was in Ohio." *Heiges v. JP Morgan Chase Bank, N.A.*, 521 F.Supp.2d 641, 646 (N.D.Ohio 2007). The trial court in this case properly found that public-policy considerations also support the conclusion that Ohio is where the cause of action accrued, because the primary effect of the credit-card agreement was in Ohio.

**{¶ 149}** The majority looks to only one aspect of the history of the case and elevates that fact—the place where payments were sent—to be dispositive. In

doing so, it ignores the many compelling facts that indicate strongly that Ohio interests predominate in this case: at all times relevant here, the decedent was an Ohio resident, she applied for the card from her residence in Ohio, and her decision not to make the payments due on her account was a decision made in Ohio. Thus, the proper result is to hold that the cause of action accrued in Ohio, *Combs*, 163 F.Supp.2d at 692-695; *Heiges* at 646, and because it accrued in Ohio, R.C. 2305.03(B) is inapplicable and Ohio law controls the determination of the statute of limitations, *Combs* at 691.

{¶ 150} The majority clings to *Meekison v. Groschner*, 153 Ohio St. 301, 91 N.E.2d 680 (1950), even though *Meekison* itself recognized that there is abundant authority for the view that a cause of action accrues where the contract is to be performed *or* where the breach occurs. *Id*. at 306. And *Meekison* is fundamentally distinguishable from this case because it involved a simple note, executed in Michigan by Michigan residents, that was required to be paid six months later "at Napoleon, Ohio" pursuant to the explicit terms of the note. *Id*. at 302-303.

{¶ 151} In litigation involving simple, short-term contracts like basic promissory notes, the rule stated in *Meekison* works well. But it retains little vitality in the context of contemporary credit-card-collection cases, which arise from monthly accountings of credit advanced by lenders to consumers for purchases and the interest or other charges that accrue with that credit, routine defaults on the required payments, and the frequent inability of consumers and creditors to maintain adequate records of the underlying contracts establishing credit-card accounts. It is no wonder that until today, no court in America has ever applied *Meekison* in a reported decision involving a credit-card debt; and it has been 35 years since an Ohio appellate court last cited *Meekison* in any context. Its holding should not be imported to the credit-card context presented by this case.

**Improper Application of Substantive Law**

**{¶ 152}** Despite the majority's haste to conclude that the cause of action accrued in Delaware and therefore that Delaware law controls the statute of limitations, the majority then ignores Delaware law in its analysis of the substantive issues before us. I am left to wonder why, if the cause of action accrued in Delaware, the majority's analysis is absolutely devoid of any discussion of Delaware substantive law. This is particularly of concern given that the decedent's attorneys provided the trial court with a Chase "cardmember agreement" as an exhibit to a filing in that court, and that agreement clearly states that the terms and enforcement of the cardholder agreement and the decedent's account were governed by federal law, "AND, TO THE EXTENT STATE LAW APPLIES, THE LAW OF DELAWARE, * * * WHERE WE AND YOUR ACCOUNT ARE LOCATED, WILL APPLY NO MATTER WHERE YOU LIVE OR USE THE ACCOUNT." (Capitalization sic.) I suspect that the majority wholly ignores Delaware law in its analysis because it cannot use Delaware law to reach the result it wants. Whatever its reasoning may be, it is clear that the majority applies Ohio law to the substantive issues without any explanation of why Ohio law controls.

**{¶ 153}** Even assuming that Ohio law controls the resolution of the substantive issues, the majority's analysis is unsatisfying.

**{¶ 154}** The majority erroneously concludes that any cause of action against the decedent accrued in Delaware because the decedent failed to make payments to Chase in Delaware. In doing so, it ignores the record before us—premised on its belief that all of the decedent's payments were sent to Delaware—when, in fact, the decedent's attorneys submitted a document obtained during discovery to the trial court establishing that she mailed payments to Delaware *and* Illinois, and the trial court relied on that evidence in considering where the cause of action accrued. If, as the majority concludes, the place of payment is dispositive, then the majority should address why Illinois law is irrelevant to the analysis.

{¶ 155} But that aside, the lead opinion's analysis of the date the cause of action accrued in this case is not sufficient.

{¶ 156} FRIC contended during discovery that the cause of action accrued on January 1, 2005, the date that the decedent "first failed to make her minimum [monthly] payment and defaulted on her obligation." The decedent did not clearly dispute that date, but in her amended counterclaim against FRIC and Cheek, she alleged that the cause of action accrued "at the latest" on August 10, 2006, a date one month after her last payment on the delinquent account. But the decedent never established that the 2006 date was the date the cause of action accrued, and she never established that FRIC's assertion that the cause of action accrued in 2005 was erroneous. The trial court found that the cause of action accrued in January 2005, and the lead opinion adopts that as the time of accrual.

{¶ 157} The author of the concurring opinion agrees with the majority's analysis and disposition of this appeal, except that the author of that opinion asserts that the cause of action did not accrue until June 28, 2006, the date on which the decedent made her last payment. The report produced by the FTC mentioned earlier suggests that the view expressed in the concurring opinion is consistent with the law of most states, i.e., that "a partial payment on a time-barred debt revives the entire balance of the debt for a new statute of limitations period." *Structure and Practices* at 47. And at least one Ohio appellate court has adopted a similar view. *Midland Funding, L.L.C. v. Hottenroth*, 2014-Ohio-5680, 26 N.E.3d 269, ¶ 24 (8th Dist.) ("Typically, the making of a partial payment on an open account before the statute of limitations expires extends the implied promise to pay the balance owed amount, acting to renew the statute of limitations period"), *appeal accepted and held for decision in this case,* 142 Ohio St.3d 1464, 2015-Ohio-1896, 30 N.E.3d 973; *see also Himelfarb v. Am. Express Co.,* 301 Md. 698, 705, 484 A.2d 1013 (1984). And one federal court, applying Delaware law, has noted that "[d]etermining whether a debt is time-barred is not always a simple task," because

courts have to "consider many factors, such as the charge-off date, tolling issues, revival issues, and any actions between the debtor and creditor that may have modified their original agreement." *Riffle v. Convergent Outsourcing, Inc.*, 311 F.R.D. 677, 684 (M.D.Fla.2015), citing *Hart v. Deshong*, 40 Del. 218, 8 A.2d 85 (Super.1939) (Delaware law recognizes that an unconditional acknowledgement of a debt or a payment on an account can extend the statute of limitations to collect the debt).

{¶ 158} Given the majority's ultimate holding that Delaware's statute of limitations applies, I need not opine on whether the lead opinion or concurring opinion, if either, is correct. I expressly use the time of accrual adopted by the lead opinion solely for purposes of evaluating the propriety of other aspects of the lead opinion.

{¶ 159} If the lead opinion is correct in its determination of the time of accrual, the lead opinion's summary analysis permitting the retroactive application of Ohio's borrowing statute is not proper.[4]

{¶ 160} Ohio's current borrowing statute, R.C. 2305.03(B), became effective on April 7, 2005. Am.Sub.S.B. No. 80, 150 Ohio Laws, Part V, 7915, 7930-7931, 8037; *see Dudek,* 702 F.Supp.2d at 836. The borrowing statute cannot be applied retroactively to deprive a party of the right to sue on an accrued substantive right, including for breach of contract. *See* Ohio Constitution, Article II, Section 28 ("The General Assembly shall have no power to pass retroactive laws"); *Gregory v. Flowers*, 32 Ohio St.2d 48, 290 N.E.2d 181 (1972), paragraph three of the syllabus ("When the retroactive application of a statute of limitation operates to destroy an accrued substantive right, such application conflicts with Section 28, Article II of the Ohio Constitution"). As Judge O'Malley wrote in

---

[4] The concurring opinion's analysis of the date the cause of action accrued places the accrual date after the effective date of the borrowing statute.

*Dudek*, a case on which the lead opinion relies, there is not an iota of authority supporting retroactive application of the borrowing statute:

> It is well-established that, in the absence of a "clear pronouncement by the General Assembly that a statute is to be applied retrospectively, a statute may be applied prospectively only." *State v. LaSalle,* 96 Ohio St.3d 178, [2002-Ohio-4009,] 772 N.E.2d 1172, 1175 (2002) [¶ 14]; *see also State v. Brooks,* 163 Ohio App.3d 241, [2005-Ohio-4728,] 837 N.E.2d 796, 800] ([4th Dist.] 2005) [¶ 13] ("In determining whether a statute is unconstitutionally retroactive, a court must first determine whether the General Assembly intended it to apply retroactively. In the absence of such an express finding by the General Assembly, the presumption of prospective application may not be overcome, and the court's inquiry into whether the statute may be constitutionally applied retrospectively ends" [citations and footnote omitted]).
>
> Nothing in the language of O.R.C. § 2305.03(B) demonstrates that the Ohio General Assembly intended the statute to apply retroactively. The Court has not located any case law suggesting that the legislature intended O.R.C. § 2305.03(B) to apply retroactively, and the parties have cited none. And, the few courts that have considered this issue have held that the borrowing statute cannot be applied retrospectively. *Curl* [*v. Greenlee Textron, Inc.*], 404 F.Supp.2d [1001,] at 1008 [(S.D.Ohio 2005)] ("[T]here [is] no precedent showing that Ohio courts would apply § 2305.03 retroactively"); *D.A.N. Joint Venture III, L.P. v. Armstrong*, [11th Dist. Lake] No. 2006-L-089, 2007-Ohio-898, ¶ 29, 2007 WL 634457 (Ohio Ct.App.2007) ("Amended R.C. 2305.03(B) cannot be

applied retroactively * * *"); *Ormond v. Anthem, Inc.*, No. 05-cv-1908, 2008 WL 906157, *19, n. 12, 2008 U.S. Dist. LEXIS 30230, *59, n. 12 (S.D.Ind. Mar. 31, 2008) ("There is no evidence that the Ohio General Assembly intended its borrowing statute to be applied retrospectively").

(Footnote omitted.) *Dudek*, 702 F.Supp.2d at 836-837.

{¶ 161} The lead opinion concedes that the effective date of the borrowing statute—the linchpin of its analysis designed to invoke Delaware's statute of limitations—was more than three months *after* the date the lead opinion determines the cause of action accrued. But it nevertheless retroactively applies the borrowing statute to appellants, blithely asserting that " ' "[a] period of limitations already running may also be shortened by the legislature" as long as "a period sufficiently long to allow a reasonable time to begin suit" is allowed.' " Lead opinion at ¶ 57, quoting *State ex rel. Nickoli v. Erie MetroParks*, 124 Ohio St.3d 449, 2010-Ohio-606, 923 N.E.2d 588, ¶ 29, quoting 1A Sackman, *Nichols on Eminent Domain*, Section 4.102[3], at 4-74 (3d Ed.2006). The lead opinion suggests that the statute of limitations can be reduced from six years to three years, because "even with that shortening, there existed a reasonably long period of time for FRIC to file suit," and therefore the lead opinion concludes that applying the borrowing statute to this case is not unconstitutional despite its retroactive application. Lead opinion at ¶ 58.

{¶ 162} But the lead opinion does not tell us why or how three years is "reasonably long," particularly when three years not only halves Ohio's six-year statute of limitations, but also obliterates FRIC's claim while breathing life into the decedent's counterclaims. The borrowing statute cannot be employed retroactively to create such a result. *See Cook v. Matvejs*, 56 Ohio St.2d 234, 237, 383 N.E.2d 601 (1978). Indeed, the lead opinion itself quotes our prior holding that the

" ' "retroactivity clause nullifies those new laws that '*reach back and create new burdens, new duties, new obligations, or new liabilities not existing at the time* [the statute becomes effective].' " ' " (Emphasis added.)  Lead opinion at ¶ 55, quoting *Tobacco Use Prevention & Control Found. Bd. of Trustees v. Boyce*, 127 Ohio St.3d 511, 2010-Ohio-6207, 941 N.E.2d 745, ¶ 14, quoting *Bielat v. Bielat*, 87 Ohio St.3d 350, 352-353, 721 N.E.2d 28 (2000), quoting *Miller v. Hixson*, 64 Ohio St. 39, 51, 59 N.E. 749, 752 (1901).  It then wholly ignores the teaching of that precedent, despite the fact that applying the borrowing statute in this case clearly imposes new duties and liabilities on appellants who, prior to today, were not forbidden from attempting to collect the decedent's debt and now are even being subjected to liability for doing so.

**No Violation of the Consumer-Protection Statutes Occurred in this Case**

{¶ 163} I agree, as a general matter, that debt collectors, including attorneys engaged in debt collections, can be held liable under both the OCSPA and the FDCPA.  *Heintz v. Jenkins*, 514 U.S. 291, 299, 115 S.Ct. 1489, 131 L.Ed.2d 395 (1995).  But I dissent strongly from the majority's conclusions that because appellants brought a claim that the court today declares was time-barred under Delaware law and because appellants requested interest in an amount in excess of Ohio's statutory interest rate, they are potentially liable under both statutory schemes.  The majority's flawed analyses of these two issues not only improperly subject appellants to liability in this case, those analyses portend great risk for all plaintiffs and their attorneys in future cases.

{¶ 164} As already explained, I would hold that the complaint was timely filed, and therefore I reject the notion that the mere filing of the complaint can be a statutory violation or can give rise to a potential abuse-of-process claim.  More importantly to the appellants before us is the fact that prior to this court's holding today, there was ample precedent to support a debt collector bringing suit in an Ohio court against an Ohio debtor for a debt that was less than six years old.

Appellants' suit was not frivolous—nor was it sanctionable under the civil rules—when the complaint was filed.[5] Liability should not be imposed on these appellants for not being sufficiently prescient to predict an outcome to this appeal that even most justices of this court likely did not expect.

{¶ 165} Turning my focus to the issue regarding the amount of interest set forth in the prayer in the complaint, the notion that FRIC's demand for 24 percent interest in the complaint giving rise to this suit violated the FDCPA and the OCSPA requires more analysis. Although I agree with the decedent's estate that FRIC ultimately did not establish that it was entitled to interest at the rate claimed in the complaint,[6] I disagree with the estate's contention—and the majority's determination—that demanding that rate in a complaint potentially violated the FDCPA and the OCSPA.

{¶ 166} FRIC contends that it cannot be held liable under the FDCPA and the OCSPA for asserting in its complaint that it was entitled to an interest rate of 24 percent. Having carefully evaluated precedent for both positions, I would adopt the view of most jurisdictions, which supports FRIC's position and is better

---

[5] If a falsehood is alleged without good cause, the court may sanction the plaintiff pursuant to the Ohio Rules of Civil Procedure. *See Argentieri v. Fisher Landscapes, Inc.*, 15 F.Supp.2d 55, 63 (D.Mass.1988) (declining to impose sanctions under the FDCPA because they were imposed under Fed.R.Civ.P. 11). But the fact that a plaintiff "demands" a particular legal conclusion, judgment, and relief, whether in compensatory or punitive damages, interest, costs, or attorney's fees, does not make the requested relief the basis for sanctions unless there is a clear showing that the attorney making the demand knew, or should have known, that the demand was not supported by the law. *See* Civ.R. 11.

[6] R.C. 1343.03(A) provides, with exceptions not relevant here, that a creditor is entitled to interest on an account in either the statutory rate as determined pursuant to R.C. 5703.47 or the interest rate set forth in a written contract entered between the parties. *See, e.g., United Collections, L.L.C. v. Tucholski*, 6th Dist. Lucas No. L-04-1314, 2005-Ohio-2495, ¶ 4, 7. "R.C. 1343.03(A) requires a written contract, not simply an additional term added to an invoice and met without resistance by another party, to establish an interest rate greater than that set forth in R.C. 5703.47." *Minster Farmers Coop. Exchange Co., Inc. v. Meyer*, 117 Ohio St.3d 459, 2008-Ohio-1259, 884 N.E.2d 1056, ¶ 25. This court, Ohio's courts of appeals, and the Sixth Circuit all hold that an invoice or billing statement is not sufficient to establish a written agreement for purposes of R.C. 1343.03(A). *See Minster Farmers* at ¶ 27-28, and cases cited therein.

reasoned and consistent with both common law and the intent and goals of the FDCPA. Several rationales are central to my conclusion.

{¶ 167} First, seeking damages, costs, and attorney's fees in a complaint is distinguishable from other conduct a debt collector may engage in. As one federal district court in Ohio has explained in dismissing a FDCPA claim that was based on the debt collector's prayer for relief:

> [A] prayer for relief does not constitute a representation that the defendant must pay the amount listed, nor that the creditor is entitled to these additional amounts. The prayer for relief is not a demand to the debtor himself. Rather, the prayer for relief is what it purports to be—a prayer or request directed to the court. The FDCPA does not extend protection to communications to courts. *See, e.g. O'Rourke v. Palisades Acquisition XVI, L.L.C.*, 635 F.3d 938, 940-41, 944 (7th Cir.2011) ("the Fair Debt Collection Practices Act does not extend to communications that would confuse or mislead a state court judge").

*Hrivnak v. NCO Portfolio Mgt.,* 994 F.Supp.2d 889, 898 (N.D.Ohio 2014).

{¶ 168} Another federal district court has explained the rationale for rejecting the argument that a debt collector violates the FDCPA by making a claim for attorney's fees in a complaint to recover the debt from the creditor:

> A prayer for relief in a complaint, even where it specifies the quantity of attorney's fees, is just that: a request to a third party— the court—for consideration, not a demand to the debtor himself. A request for attorney's fees ultimately rests upon the discretion of the court and a determination of applicability at a later stage of the

litigation. The whole purpose of regulating debt collection was to "supervise" a range of unsupervised contacts, such as demand letters and late-night telephone calls. In contrast, a statement in a pleading is supervised by the court and monitored by counsel. The two situations are drastically different.

(Footnote omitted.) *Argentieri v. Fisher Landscapes, Inc.*, 15 F.Supp.2d 55, 61-62 (D.Mass.1998.)

**{¶ 169}** Other federal courts around the country have adopted rationales similar to *Hrivnak* and *Argentieri*. *See, e.g., Sayyed v. Wolpoff & Abramson, L.L.P.*, 733 F.Supp.2d 635, 649 (D.Md.2010) (holding that a prayer for attorney's fees was "a request directed to the court, not a communication directed to the debtor, and certainly not a misrepresentation"); *Winn v. Unifund CCR Partners*, D.Ariz. No. CV 06-447-TUC-FRZ, 2007 WL 974099, *3 (Mar. 30, 2007) (a prayer for relief "is what it purports to be—a 'prayer' or request for a certain amount of attorney's fees"); *Rael v. Davis*, S.D.Ind. No. 1:06-cv-0081-JDT-TAB, 2006 WL 2346396, *5 (Aug. 11, 2006) (holding that a request for attorney's fees in a complaint was a request to the court, not a demand on the debtor, and noting that "resolution of the request ultimately would depend on future events and the judgment of the state court judge"). As the Seventh Circuit has noted,

Whatever shorthand appeared in the complaint * * * was harmless rather than an effort to lead anyone astray. It was the judge, not [the debtor], who had to be able to determine to whom the debt was owed, for it is the judge (or clerk of court) rather than the defendant who prepares the judgment specifying the relief to which the prevailing party is entitled.

*Beler v. Blatt, Hasenmiller, Leibsker & Moore, L.L.C.*, 480 F.3d 470, 473 (7th Cir.2007).

{¶ 170} Only a few cases have addressed the specific context of a prayer for interest in a complaint that seeks to collect a debt. I agree with those that have adopted and applied the rationale in *Argentieri* to cases in which interest is sought in a complaint. *See, e.g., Hart v. Pacific Rehab of Maryland, P.A.*, D.Md. No. ELH-12-2608, 2013 WL 5212309, *23 (Sept. 13, 2013) (holding that a request for prejudgment interest in a complaint is akin to a request to a court for attorney's fees and is not actionable as an improper FDCPA representation); *Bird v. Pressler & Pressler, L.L.P.*, E.D.N.Y. No. 12-CV-3007(JS)(ETB), 2013 WL 2316601, *2 (May 28, 2013) (applying *Argentieri* and finding no FDCPA violation because a complaint's "prayer for relief of pre-judgment interest is a request upon the Court").

{¶ 171} Put another way, demands made in a complaint are "aspirational" requests, not absolute statements of entitlement. *Cisneros v. Neuheisel Law Firm, P.C.*, D.Ariz. No. CV06-1467-PHX-DGC, 2008 WL 65608, *3 (Jan. 3, 2008) (noting that the "fact that the prayer alleges a special amount is no more binding on Plaintiff than any other factual allegation in the complaint" and that "the prayer for relief is aspirational—it describes what the collection agency seeks if it prevails, including 'such other and further relief as the Court may deem just and proper' ").

{¶ 172} Indeed, Ohio law has long held that the prayer is not a dispositive portion of the complaint. "The prayer of a petition is no part of the cause of action, but merely indicates the object thereof, the remedy sought or the legal consequences of the facts set forth in the petition. It is a mere incident to the petition." *Harbage v. Ferguson*, 27 Ohio Law Abs. 227, 229, 1938 WL 3192 (C.P.1938). *See also Martini v. Cicatiello*, 74 Ohio Law Abs. 289, 292, 140 N.E.2d 336 (7th Dist.1955), quoting 19 American Jurisprudence, Equity, Section 226, at 181 (1939) (" 'Prayers for relief are special or general, and the cautious pleader includes both in his bill. *In the special prayer, the complainant indicates the particular relief which he*

*deems suited to his case and asks the court to grant that relief; in the prayer for general relief, he merely asks that he may have "such other, further, and general relief as he may be entitled to*" ' " [footnote deleted and emphasis added]). In other words, the prayer merely reflects what the plaintiff seeks from the court, but the complaint sets forth the theory of the case, and the evidence on damages adduced in discovery and/or presented at trial controls the relief that the court ultimately orders. *See James H. Herron Co. v. Jones*, 28 Ohio App. 190, 197, 162 N.E. 624 (8th Dist.1927); *McGurrer v. Halliday*, 15 Ohio Dec. 753, 754, 1905 WL 1273 (C.P.1905). Until today, the prayer alone has not been regarded as dispositive in determining the nature of the cause of action. *Goldstein v. Rousey*, 8 Ohio Law Abs. 439, 440, 1930 WL 2164 (1st Dist.1930); *accord Roller v. Patrick*, 145 Ohio St. 572, 579, 62 N.E.2d 367 (1945). "[T]he prayer of a pleading is no part of the cause of action, and the relief which may be given may be different than that asked for in the prayer, but the prayer may be examined to determine what the pleader intends by his pleading and the relief he is seeking and supposes he is entitled to receive." *Parker v. Cent. Mfrs. Mut. Ins. Co.*, 98 Ohio App. 169, 176, 128 N.E.2d 440 (3d Dist.1953). The character of a claim should continue to be determined by the contents of the entire complaint, and not, as the majority does here, by focusing solely on the prayer. *See Martini* at 292.

{¶ 173} The court of appeals in this case distinguished this matter from *Argentieri* and instead relied upon *Foster v. D.B.S. Collection Agency*, 463 F.Supp.2d 783 (S.D.Ohio 2006). The majority embraces *Foster* as well. But *Foster* is wholly inapposite here.

{¶ 174} The court in *Foster* found that a violation of 15 U.S.C. 1692e(2)(b) occurred because a request for *attorney's fees*—not for interest—was made upon the debtors despite the fact that such fees *were categorically barred* by an Ohio statute, former R.C. 1301.21 (proscribing creditors from recovering attorney's fees incurred during litigation to collect "personal, family or household" debt). *Id*. at

802. *Foster* turned on the court's determination that the demand in the complaint "constituted an absolute entitlement to attorney fees, even though such fees are not recoverable under Ohio law." *Id*.

{¶ 175} Similarly, the other courts that have found parties potentially liable under the FDCPA based on prayers in complaints have focused on the fact that the relief sought in the prayers was impossible or improper *as a matter of law*. *See, e.g., LeBlanc v. Unifund CCR Partners*, 601 F.3d 1185, 1193, 1195-1198 (11th Cir.2010) (liability could arise from a debt collector's threat to file a lawsuit when the debt collector had failed to comply with a statutory requirement to register as a debt collector and therefore could not legally bring suit); *Bradshaw v. Hilco Receivables, L.L.C.*, 765 F.Supp.2d 719, 729-730 (D.Md.2011) (viewing the filing of a debt-collection lawsuit without the required statutory license as "a threat to take * * * action that cannot legally be taken" under 15 U.S.C. 1692e(5)); *Russey v. Rankin*, 911 F.Supp. 1449, 1454 (D.N.M.1995) (a debt collector's letter threatening to file a collection lawsuit when the debt collector could not file a lawsuit in its own name was an action that could not legally be taken). *See also Harrington*, 508 F.Supp.2d at 136 (a fraudulent motion for default judgment is a "threat to take action that cannot legally be taken" in violation of 15 U.S.C. 1692e(5)).

{¶ 176} The majority relies heavily on the Sixth Circuit's decision in *Stratton v. Portfolio Recovery Assocs., L.L.C.,* 770 F.3d 443 (6th Cir.2014) to hold that a mere request in a complaint for interest that is not available violates the FDCPA. But as Judge Batchelder explained in her dissent in *Stratton*, that opinion is built on shaky foundations:

> Particularly pernicious is the majority's holding that Stratton has stated a claim under § 1692e(5). Section 1692e(5) prohibits "[t]he threat to take any action that cannot legally be taken or that is

74

not intended to be taken." In this case, however, PRA actually filed a state court complaint; it did not *threaten* to do so.

We instructed in *Hartman v. Great Seneca Financial Corp.,* 569 F.3d 606, 611 (6th Cir.2009), that "[w]hen interpreting the FDCPA, we begin with the language of the statute itself." (internal quotation marks omitted). Although § 1692e broadly prohibits a debt collector from using "any false, deceptive, or misleading representation or means in connection with the collection of any debt," Stratton pleaded a violation of § 1692e(5), which specifically requires a "threat." The majority is right that we may "proscribe other improper conduct which is not specifically addressed" under § 1692e, but Stratton has not alleged a violation of § 1692e and § 1692e(5) does not authorize the majority to ignore the specific textual requirement.

To hold that PRA threatened to take illegal action the majority must mean either (1) filing a complaint can be a "threat" within the meaning of § 1692e(5), or (2) § 1692e(5) penalizes even actions that have already been taken. Neither proposition is true.

\* \* \*

We have never held that filing a complaint is itself a "threat" within the meaning of § 1692e(5). The source of authority for the majority's contrary conclusion is our unpublished opinion in *Gionis v. Javitch, Block, Rathbone, LLP,* 238 Fed.Appx. 24 (6th Cir.2007). But in *Gionis* the actual "threat" to recover unauthorized attorney fees appeared in an affidavit appended to the complaint, not in the complaint itself. We said explicitly that the "unlawful 'threat' to collect attorney fees was made in the Affidavit," *id.* at 29, which was intended to communicate directly with the debtor; the complaint was

not itself the "threat." Both *Foster v. D.B.S. Collection Agency,* 463 F.Supp.2d 783 (S.D.Ohio 2006), and *Poirier v. Alco Collections, Inc.,* 107 F.3d 347 (5th Cir.1997), are similarly distinguishable.

> The reason for excluding complaints from "threat" liability should be clear. If filing a court complaint is per se a "threat," then every time a debt collector loses in court it has threatened to take action it may not legally take—it has thus violated the FDCPA. The "least sophisticated consumer" standard does not mean that every time a debt collector makes a reasonable mistake of fact or law it has thus violated federal law. To hold that Congress contemplated such a scheme defies belief.

(Emphasis sic.) *Stratton*, 770 F.3d at 454 (Batchelder, J., dissenting).

{¶ 177} FRIC's request for interest at the 24 percent rate was not necessarily barred by Ohio law. Had FRIC produced the actual agreement at issue in this case and had the agreement provided that an interest rate in excess of the statutory limitation was agreed to by both of the originally contracting parties, FRIC might have been entitled to an award of interest at that rate. I cannot conclude that interest at the 24 percent rate is recoverable here, because no party in this case produced the original agreement during discovery. My conclusion, however, is quite different from a determination that FRIC was barred, as a matter of law, from seeking interest at that rate in its complaint against the decedent. FRIC's claim for 24 percent interest fails because of an evidentiary shortcoming that was not clarified in the discovery process, not because FRIC is barred, as a matter of law, from seeking that interest.

{¶ 178} As many courts have recognized in similar situations, the fact that FRIC did not establish its entitlement to 24 percent interest at the initial pleading stage is not the same as FRIC making a false representation that it was entitled to

24 percent interest. *See Matrix Acquisitions, L.L.C. v. Swope*, 8th Dist. Cuyahoga No. 94943, 2011-Ohio-111, 2011 WL 208063, ¶ 18 ("Even if a 25% interest rate is 'impermissible,' as Swope claims, the [trial] court's ruling does not conflict with its finding that Matrix did not violate the FDCPA or the OCSPA because the court was to determine the proper interest rate at trial"). This is particularly true given that both the decedent and appellants attempted to use billing statements as evidence during the litigation, and the billing statements in the record consistently reflect that the applicable interest rate was understood to be 24.99 percent.

{¶ 179} Everything in a complaint and counterclaim filed in a court is an allegation, subject to being admitted or denied by the opposing party and then clarified through the discovery process and in subsequent litigation. *See Hillin v. Beightler*, 32 Ohio Law Abs. 251, 1939 WL 8086 (2d Dist., Franklin Cty., 1939). Indeed, the decedent employed this same understanding throughout her class-action counterclaims, asserting allegations based on purported facts (e.g., the decedent's averment of how a debt buyer paid for her debt) or legal conclusions (e.g., the decedent's assertions that FRIC and Cheek had engaged in deceptive acts and should be subject to punitive damages). Nothing more was required of the decedent and quite properly so. But equity requires that nothing more should be required of FRIC.

{¶ 180} Lastly, the majority ignores that Ohio is a notice-pleading state, *State ex rel. Yeaples v. Gall*, 141 Ohio St.3d 234, 2014-Ohio-4724, 23 N.E.3d 1077, ¶ 41 (O'Neill, J., dissenting), citing *Cincinnati v. Beretta U.S.A. Corp.*, 95 Ohio St.3d, 416, 2002-Ohio-2480, 768 N.E.2d 1136, ¶ 29, and, therefore, FRIC was not required to plead operative facts beyond its general allegations and needed only to give adequate notice of its claims to allow the decedent to fairly defend against them. *See Iacono v. Anderson Concrete Corp.*, 42 Ohio St.2d 88, 92, 326 N.E.2d 267 (1975). Moreover, FRIC was required to include that request for relief in its prayer in order to pursue the opportunity to recover interest. *See, e.g.*, Civ.R. 8(A).

FRIC properly attached to its complaint copies of the bills of sale of the rights to the decedent's account and a billing statement that Chase had sent to the decedent, thereby giving the decedent more definitive notice of its claim for interest and the basis of that claim. Rather than being used to abuse or harass a debtor, that information was used to clarify and contextualize the claim for interest.

{¶ 181} Having considered the complaint as a whole, I would hold that liability under the FDCPA and OCSPA does not attach when the prayer in the complaint simply sets forth the relief that the plaintiff seeks if it proves its case.

## CONCLUSION

{¶ 182} Debt collection can be a hardhearted business. When debt collectors violate consumer-protection laws, they should be held accountable. However, no violations occurred in this particular case.

{¶ 183} In its efforts to solve a very large and very complex problem, the lead opinion makes analytical leaps over mountains of precedent without providing satisfying explanations: Delaware's statute of limitations controls causes of action based on credit-card debt simply because Ohio consumers have mailed (or should have mailed) payments to Wilmington in that state; Ohio's borrowing statute can be retroactively applied to not only deprive plaintiffs of their causes of action but also to subject them to liability where liability was not clear before; and requests for relief made by a plaintiff's attorney in a complaint—whether for attorney fees, or interest, or punitive damages—can be used to establish liability against the attorney as well as the attorney's client.

{¶ 184} If nothing else, it seems ironic that if the precedent established today by the court is faithfully applied in future cases, consumers and plaintiffs will lose many benefits provided to them by Ohio law through the same opinion that the majority evidently believes will save them.

FRENCH, J., concurs in the foregoing opinion.

_____

Burke & Horrigan, James F. Burke Jr., and John J. Horrigan, for appellee.

Surdyk, Dowd & Turner Co., L.P.A., Jeffrey C. Turner, John Langenderfer, and Kevin A. Lantz, for appellants First Resolution Investment Corporation and First Resolution Management Corporation.

Law Office of Boyd W. Gentry, L.L.C., and Boyd W. Gentry, for appellants Cheek Law Offices, L.L.C., and Parri Hockenberry.

Michael DeWine, Attorney General, Michael J. Hendershot, Chief Deputy Solicitor, and Tracy M. Dickens, Teresa A. Heffernan, Jeffrey Loeser, Brittany M. Steele, and Melissa G. Wright, Assistant Attorneys General, urging affirmance for amicus curiae state of Ohio.

Burdge Law Office Co., L.P.A., and Ronald L. Burdge, urging affirmance for amicus curiae AARP.

Sessions, Fishman, Nathan & Israel, L.L.C., and Michael D. Slodov, urging reversal for amici curiae Ohio Creditors Attorneys Association and DBA International.

_____